

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-1996

# Washington v. Phila Cty Ct

Precedential or Non-Precedential:

Docket 95-1613

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Washington v. Phila Cty Ct" (1996). *1996 Decisions.* Paper 96.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/96

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 95-1613
_____


MARTIN O. WASHINGTON,


v.

PHILADELPHIA COUNTY COURT OF COMMON PLEAS

Martin Washington,
Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 92-3637)
_____

Submitted Under Third Circuit LAR 34.1(a)
Monday, March 11, 1996

Before: NYGAARD, SAROKIN,
and ALDISERT, Circuit Judges
_____

(Opinion filed July 9, 1996)


David Rudovsky
Kairys, Rudovsky, Kalman & Epstein
924 Cherry Street, Suite 500
Philadelphia, PA 19107

Alan B. Epstein
Jablon, Epstein, Wolf & Drucker
The Bellevue, Ninth Floor
Broad and Walnut Streets
Philadelphia, PA 19102

Attorneys for Appellant

A. Taylor Williams
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102

Attorney for Appellee

_____

OPINION OF THE COURT
_____


SAROKIN, Circuit Judge:

Appellant filed various claims against his former employer alleging racial discrimination and retaliatory harassment and discharge as a result of his pursuit of discrimination claims in agency proceedings. He eventually prevailed on the retaliation claim, though not on the claim of pre-retaliation discrimination. At the conclusion of the proceedings, Appellant petitioned for attorneys' fees, and his request was reduced by the district court by more than eighty percent. He now appeals the reduction of the fee award.

I. Facts and procedural posture

On June 22, 1992, Martin Washington filed an action in the United States District Court for the Eastern District of Pennsylvania against his former employer, the Philadelphia County Court of Common Pleas (the "County Court" or the "Court"). Mr. Washington's nine-count complaint alleged racially discriminatory acts with respect to employment under both federal and state statutes; retaliatory harassment and discharge after he filed an administrative claim of racial discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Rights Commission, under both federal and state statutes; civil rights violations under federal and state statutes; violation of Pennsylvania's public policy and common law; and breach of contract of employment.

Five of the nine counts were dismissed on summary judgment in June 1993. The case eventually went to trial in November 1993. At the conclusion of the trial, the jury found that the County Court did not discriminate against Mr. Washington on the basis of race. The jury did find, however, that the Court had unlawfully retaliated against Mr. Washington for filing his administrative claims, and awarded him compensatory damages of $25,000. After the jury verdict, the district court granted a post-trial Motion for Judgment as a Matter of Law to the County Court setting aside the jury verdict.

Mr. Washington appealed to this Court. We reversed the district court's order granting the post-trial motion, and reinstated the jury verdict. Washington v. Philadelphia County Court of Common Pleas, 47 F.3d 1163 (3d Cir. 1995) [table]. On remand, judgment was entered for Mr. Washington on the verdict.

At the conclusion of these proceedings, Mr. Washington's lead attorney, Alan B. Epstein, filed a Petition for Attorneys' Fees claiming that Mr. Washington was the "prevailing party" and seeking a total award of $175,987.50 in attorneys' fees for himself and two colleagues at the firm of Jablon, Epstein, Wolf

and Drucker.  Mr. Washington also sought fees of $3060 for Lanier B. Williams, his attorney in the administrative proceedings, as well as $7973.87 in plaintiff costs.  Plaintiff's Petition for Attorneys' Fees and Reimbursement of Costs of Litigation, Washington v. Philadelphia County Court of Common Pleas, No. 92-CV-3637 (E.D. Pa. Apr. 3, 1995) [hereinafter Petition] (JA 12).  The County Court challenged, inter alia, the sum requested for Mr. Epstein and his colleagues, asserting that both the hourly fees and hours requested were excessive.  Objections of Defendant, Court of Common Pleas of Philadelphia County to Plaintiff's Petition for Attorneys' Fees and Reimbursement for Costs of Litigation, Washington v. Philadelphia County Court of Common Pleas, No. 92-CV-3637 (E.D. Pa. Apr. 28, 1995).

On June 30, 1995, the district court entered a memorandum and order on the fee request.  Washington v. Philadelphia County Court of Common Pleas, No. 92-CV-3637 (E.D. Pa. June 30, 1995) (mem.) [hereinafter Memorandum].  The court decreased the number of hours allowable by one half, finding Mr. Epstein's claim "excessive and unreasonable," id., typescript at 8, and by an additional fifty percent because Mr. Washington "hardly won a decisive victory in this case."  Id.  The court, however, did not extend the fifty-percent reduction to hours claimed in preparation of the fee petition.

Regarding the hourly rates sought by Mr. Epstein and his colleagues, the district court deemed it "impossible to consider [them] as bona fide hourly rates."  Id., typescript at 11.  Instead, the court concluded that "a reasonable hourly rate for [Alan B.] Epstein is $175 per hour.  A reasonable rate for [Thomas D.] Rapp is $100 per hour.  A reasonable rate for [Nancy] Abrams is $85 per hour."  Id., typescript at 12.

Based on its various assessments, the court calculated the amount of the award for Mr. Epstein and his colleagues at $30,389.63, roughly seventeen percent of Mr. Epstein's request.  Id., typescript at 13.  In addition, the court disallowed any fee for Mr. Williams, "who unsuccessfully represented Washington at his PHRC hearing," id., and awarded $7973.97 for plaintiff costs.  Id.

Mr. Washington is now appealing the district court's order reducing the counsel fees.  He argues that:

> The district court erred as a matter of law in its reduction of the hourly rate for plaintiff's counsel and in its reduction of the compensable hours reasonably expended by counsel in this litigation.  On both issues the district court applied erroneous legal standards; further, on the compensable hours issue, the court made clearly erroneous factual determinations.

Brief of Appellant at 12.

## II. Jurisdiction

This action was commenced pursuant to the Civil Rights Act of 1964, as amended, 42 U.S.C.   2000e et seq.  The district court had jurisdiction pursuant to 42 U.S.C.   2000e-5(f)(3) and

28 U.S.C.    1331 and 1343.  Plaintiff's various state claims were properly before the district court pursuant to the doctrine of supplemental jurisdiction as codified at 28 U.S.C.    1367(a).

The district court issued a final order on Plaintiff's petition for attorneys' fees on June 30, 1995.  We have jurisdiction over an appeal from this order pursuant to 28 U.S.C.    1291.

## III. Analysis

We review the reasonableness of an award of attorney's fees for an abuse of discretion.  Rose v. Dellarciprete, 892 F.2d 1177, 1182 (3d Cir. 1990).  The question of what standards to apply in calculating an award of attorneys' fees is a legal question, and therefore we exercise plenary review over this issue.  Keenan v. City of Philadelphia, 983 F.2d 459, 472 (3d Cir. 1992).

The matter of an attorney's marketplace billing rate is a factual question which is subject to a clearly erroneous standard of review.  Student Public Interest Research Group v. AT & T Bell Laboratories, 842 F.2d 1436, 1442 (3d Cir. 1988) (citing Black Grievance Committee v. Philadelphia Electric Co., 802 F.2d 648, 652 (3d Cir. 1986) (citation omitted), vacated on other grounds, 483 U.S. 1015 (1987)).  More generally,

> the appellate court may not upset a trial court's exercise of discretion on the basis of a visceral disagreement with the lower court's decision. Similarly, the appellate court may not reverse where the trial court employs correct standards and procedures, and makes findings of fact not clearly erroneous.  In sum, "[i]f the district court had applied the correct criteria to the facts of the case, then, it is fair to say that we will defer to its exercise of discretion."

Northeast Women's Center v. McMonagle, 889 F.2d 466, 475 (3d Cir. 1989) (quoting Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir. 1976) (in banc) (citation omitted)), cert. denied, 494 U.S. 1068 (1990).

### A. The law of the lodestar

The Supreme Court has held that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); see also Rode, 892 F.2d at 1183 (same).  The result of this computation is called the lodestar.  The lodestar is strongly presumed to yield a reasonable fee.  City of Burlington v. Dague, 505 U.S. 557 (1992).

In this instance, the district court rejected Plaintiff's claims with regard to both the billing rates of his attorneys and the numbers of hours reasonably expended on the litigation.  We review each element in turn.

## B. The billing rates

The general rule is that a reasonable hourly rate is calculated according to the prevailing market rates in the community. Blum v. Stenson, 465 U.S. 886, 895-96 n.11 (1984); Student Public Interest Research Group, Inc., 842 F.2d at 1448 (adopting the community market rule). The prevailing party bears the burden of establishing by way of satisfactory evidence, "in addition to [the] attorney's own affidavits," Blum, 465 U.S. at 895 n.11, that the requested hourly rates meet this standard.

In the instant matter, counsel Alan Epstein sought hourly fees of $250 and $275 for himself; fees of $140 and $165 per hour for an associate, Thomas D. Rapp; and fees of $140 and $150 per hour for another associate, Nancy Abrams. Petition, typescript at 10. In support of the request, the lawyers submitted numerous documents, including a "Verification" (in effect, an affidavit) from Mr. Epstein for the fees cited, affidavits from various Philadelphia lawyers practicing in employment discrimination cases suggesting fees comparable to Mr. Epstein's, and billing statements in the case.

As the district court accurately noted, "[t]he issue of determining the reasonable hourly rate for an attorney, and the specific issue of determining a reasonable rate for Epstein and his associates are not unchartered waters in the district," Memorandum, typescript at 9. On two earlier occasions, the district court had considered similar requests from Mr. Epstein. Griffiths v. Cigna Corp., No. CIV. A. 91-2356 (E.D. Pa. Oct. 6, 1994) (VanArtsdalen, J.) (Memorandum and Order); Oliver v. Bell Atlantic Corp., No. CIV. A. 92-751 (E.D. Pa. June 30, 1994) (Robreno, J.) (Order Memorandum). In both cases, the court rejected Mr. Epstein's claim and lowered his fee from the requested $250 an hour to a "reasonable hourly rate" of $175 per hour. Griffiths, 1994 WL 543501, *2; Oliver, 1994 WL 315815, **4-5. It is worth noting that the court's determination in Oliver was based on Judge VanArtsdalen's analysis in Griffiths.

The court in the instant case rejected Mr. Epstein's request as well and concluded:

> I will follow the rulings made by Judge VanArtsdalen in
> Griffith [sic] and Judge Robreno in Oliver. I find
> that a reasonable rate for Epstein is $175 per hour. A
> reasonable rate for Rapp is $100 per hour. A
> reasonable rate for Abrams is $85 per hour.

Memorandum, typescript at 2.

Those rulings, however, are no longer valid. This Court recently vacated the district court's decision in Griffiths on the very issue of hourly rates. Griffiths v. Cigna Corp., Nos. 94-2090 & 94-2091 (3d Cir. Nov. 30, 1995) (unpublished). In rejecting the district court's determination, we explained:

> As the prevailing party, Griffiths had the burden
> of demonstrating "the community billing rate charged by
> attorneys of equivalent skill and experience performing
> work of similar complexity." See PIRG, 842 F.2d at
> 1450. We find that he did sustain that burden as to

Mr. Epstein's requested rate of $250 per hour, by submitting the affidavits of Harold Goodman, Alica Ballard, and Lorrie McKinley, attorneys in the Philadelphia area who represent plaintiffs in civil rights litigation. These affidavits stated that Mr. Epstein's requested hourly rate of $250 was reasonable and within the range of prevailing rates charged by Philadelphia attorneys with Mr. Epstein's skill and experience. The opposition submitted by CIGNA failed to rebut plaintiff's submissions on this point, both because CIGNA's affidavits focused on the market rates of defense attorneys, and because CIGNA did not otherwise effectively challenge the content of plaintiff's affidavits.

Where, as here, the plaintiff has met his prima facie burden under the "community market rate" lodestar test, and the opposing party has not produced contradictory evidence, the district court may not exercise its discretion to adjust the requested rate downward. Accordingly, we will vacate the attorneys' fee award with respect to the hourly rate allowed for Mr. Epstein's services, and direct that his services be compensated at the $250 rate that plaintiff's uncontroverted proofs established.

By contrast, plaintiff did not meet his prima facie burden of proof with respect to the rates of plaintiff's other attorneys, Mr. Rapp and Ms. Adams. Specifically, Griffiths failed to demonstrate that the requested rates were the prevailing rates in the community. In the absence of such a showing, the district court must exercise its discretion in fixing a reasonable hourly rate. This court cannot say that $100 and $85 per hour are unreasonable, and accordingly the district court's award based on these rates will be affirmed.

Id., typescript at 14-16.

Our reasoning in Griffiths applies with equal strength in the instant matter. (It is worth noting that the same attorneys filed affidavits in support of Mr. Epstein's claim, and the district court even noted that Ms. Ballard "apparently filed an identical affidavit before Judge VanArtsdalen in the Griffith[sic] case."). See also Black Grievance Committee, 802 F.2d at 652-53 (district court is not free to disregard attorney's affidavit when the other party "filed no affidavit and offered no testimony contesting the accuracy of [the attorney's] statement with respect to charges by comparable practitioners"); Cunningham v. City of McKeesport, 753 F.2d 262, 268 (3d Cir. 1985) (no material issue of fact when affidavit is uncontradicted), vacatedon other grounds, 478 U.S. 1015 (1986).

Therefore, we vacate and remand to the district court to reconsider the appropriate hourly fee for Mr. Epstein's services in light of Griffiths, and we affirm the district court's

reduction of Mr. Rapp's and Ms. Adams's hourly fees.

## C. The number of hours

In support of the petition, Mr. Epstein submitted forty pages of itemized records specifying the date when the work was performed, the attorney performing the work, the nature of the work (e.g., "Prepare complaint," "Conference with Alan Epstein regarding liability issues"), the amount of time spent and the hourly rate charged for that particular task. JA 90-129.

The district court dramatically reduced the hours allowed. First, in spite of the documentation submitted by Mr. Epstein, the district court found that the hours set forth were "not properly documented." Memorandum, typescript at 5. As the court explained,

> [i]t would be fair to say that most of the entries are vague and identified only by non-descriptive statements such as "research", "review", "prepare", "letter to", and "conference with." Descriptions such as this do not suffice in establishing the reasonableness of a fee petition.

Id. (citation omitted).

Second, the court found that "many of the billable hours requested are redundant, unnecessary or excessive." Id. The court gave various examples of what it considered excessive, including that "Epstein, an experienced litigator, claims 69.6 hours for unspecified 'trial preparation', an amount of time approximately twice as long as the trial itself." Id., typescript at 6.

Third, the court found that "requesting that this Court approve an expenditure of over $175,000 in fees to obtain a $25,000 verdict is nonsensical." Id., typescript at 7.

On the basis of these concerns, and following the lead of Judge Robreno in Oliver, the district court decreased the number of hours to be billed by one-half "on the grounds that they are excessive and unreasonable." Id., typescript at 8. In addition, the court decreased the hours by another fifty percent on the basis that "Washington hardly won a decisive victory in this case." Id. The court pointed out that five of Mr. Washington's nine claims were dismissed on summary judgment, that he did not prevail on "his primary claim," racial discrimination, and that the jury had awarded him far less than the $661,756.02 in damages and $103,000 in lost wages he initially sought. Id.

### 1. Specificity

We first review the district court's conclusion that Mr. Epstein did not adequately document the hours claimed. Attorneys seeking compensation must document the hours for which payment is sought "with sufficient specificity." Keenan, 983 F.2d at 472. More specifically, our jurisprudence has established that "[a] fee petition is required to be specific enough to allow the district court 'to determine if the hours claimed are unreasonable for the work performed.'" Id. at 473 (citing Rode, 892 F.2d at 1190 (citation omitted)). It is an established proposition of law that "[w]here the documentation of hours is

inadequate, the district court may reduce the award accordingly." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). This proposition, however, only begs the question of what constitutes adequate documentation.

In answering this question, we do not operate in a legal vacuum. On several occasions, this Court has considered the proper degree of specificity required of a party seeking attorneys' fees. In particular, we recently undertook such a review in Rode v. Dellarciprete, 892 F.2d 1177 (3d Cir. 1990). We explained that specificity should only be required to the extent necessary for the district court "to determine if the hours claimed are unreasonable for the work performed." Id. at 1190 (citing Pawlak v. Greenawalt, 713 F.2d 972, 978 (3d Cir. 1983), cert. denied sub nom. International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Pawlak, 464 U.S. 1042 (1984)). Specifically,

> a fee petition should include "some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates." However, "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."

Rode, 892 F.2d at 1190 (citing Lindy Bros. Builders, Inc. of Philadelphia, 487 F.2d at 167).

Because we found that the district court had applied too exacting a standard in reducing hours for lack of specificity, we vacated its determination. The party seeking counsel fees had submitted various documents as evidence of the hours spent on the case, including a "computer-generated chronological list of the tasks performed and the time devoted to those tasks by the two attorneys, the paralegal and the law clerk who worked on the case." Id. at 1189. The district court found fault with the presentation of the records in simple chronological order, but we rejected the court's imposition of a requirement that records be kept by task -- e.g., for each motion, issue or part of the case. Id. at 1189-90. The district court also found that the list did not "provide[] adequate and specific descriptions of services and the time devoted to those services." Id. at 1190. In fact,

> [e]ach entry provided the general nature of the activity and the subject matter of the activity where possible, e.g., T (Dusman); CF (client); R (re appeals), the date the activity took place and the amount of time worked on the activity.

Id. at 1191.

We concluded that the submissions in support of the petition "provided enough information as to what hours were devoted to various activities and by whom for the district court to determine if the claimed fees are reasonable." Rode, 892 F.2d at 1191.

We recently reaffirmed our Rode holding, noting that the Court in Rode "found sufficient specificity where the computer-

generated time sheet provided 'the date the activity took place.'" Keenan v. City of Philadelphia, 983 F.2d 459, 473 (3d Cir. 1992). In Keenan, we found that "computer-generated summaries of time spent by each attorney and paralegal met the standards of Rode." Id.

The computerized lists submitted by Mr. Epstein and his colleagues clearly meet the standards that we found satisfactory in Rode and Keenan. Therefore, as we did in Rode, we find that the district court applied erroneous legal standards when it concluded that the hours were not properly documented.

### 2. Excess

We now turn our attention to the district court's conclusion that the hours are "excessive and unreasonable." Memorandum, typescript at 8. The court gave seven separate examples of the alleged "outrageousness" of Mr. Epstein's claim, having to do with hours claimed for the review of an entry of appearance filed by the County Court's counsel, discovery planning, research on a motion to compel filed by the Court, review of the Court's motion for summary judgment and preparation of the response, trial preparation, review of trial tapes, and preparation of post-trial motions. The court found that "[t]hese figures are not merely excessive, they border on the outrageous." Id., typescript at 7.

Mr. Epstein challenges the court's conclusions regarding these various examples. In the first instance, the court deemed as "redundant, unnecessary or excessive" 5.5 hours for research on a motion to compel filed by the County Court. Memorandum, typescript at 6. The motion was apparently to compel Mr. Washington to submit to an examination by a psychologist and, according to Mr. Epstein, certainly required the number of hours claimed:

> Plaintiff filed an answer and an eight-page memorandum
> of law. The trial court does not explain why 5.5 hours
> is excessive on this less than ordinary discovery
> issue. To the contrary, research and drafting of these
> papers would likely take a lawyer the 5.5 hours
> claimed.

Brief of Appellant at 24.

The second example given by the district court to which Mr. Epstein objects is time amounting to 158.2 hours spent in preparing for and litigating the County Court's motion for summary judgment. Mr. Epstein justifies the number of hours on the length of the County Court's motion, the number of issues it raised, the voluminous record and the length of his reply memorandum. Id. at 24-25.

Third, the court stated that "Epstein, an experienced litigator, claims 69.9 hours for unspecified 'trial preparation', an amount of time approximately twice as long as the trial itself ($17,400)." Memorandum, typescript at 6. Mr. Epstein argues in response that "this ratio is quite reasonable and that experienced and successful trial lawyers spend substantially more time in preparation than they do in the courtroom." Brief of Appellant at 25.

Fourth, the court stated that "Epstein claims 26.1 hours in reviewing tapes of the trial for the preparation of post-trial

motions, an amount of time almost as long as a minute-by-minute replay of the entire trial, from voir dire to verdict ($6,525)." Memorandum, typescript at 6. Here again, Mr. Epstein offers a detailed explanation for the time:

> The motion for judgment as a matter of law was based on the argument that there was insufficient evidence to support the jury's verdict. To properly respond to this motion, plaintiff was obligated to marshall every fact and every piece of evidence that a reasonable jury could have relied upon to reach its verdict. This in turn required a detailed and exact review of all of the testimony in the case to assemble the relevant evidence that supported the verdict.

Brief of Appellant at 26.

Finally, Mr. Epstein challenges findings by the district court regarding "some very minor categories" on the ground that "each is reasonable." Id. at 27.

Our task is not to determine whether, sitting as a court of first instance, we would have reached the same conclusion as the district court did. Rather, we only review the court's finding that the hours claimed by Mr. Epstein are "excessive and unreasonable" for clear error. While Mr. Epstein offers persuasive arguments to support the hours he and his colleagues spent on the various parts of the trial, we conclude that these arguments fall short of satisfying our exacting standard of review and therefore conclude that the district court's conclusion is not clearly erroneous.

### 3. Proportionality

The district court stated that "[b]y any standard, requesting that this Court approve an expenditure of $175,000 in fees to obtain a $25,000 verdict is nonsensical." Memorandum, typescript at 7. Mr. Epstein challenges this statement on the ground that the court's position violates Third Circuit law against proportionality analysis to determine the reasonableness of counsel fees. Brief of Appellant at 29.

It is true that this Court has expressed serious concerns with the practice of limiting an award of attorney's fees to maintain proportionality between the fees and the amount of damages awarded. See, e.g., Cunningham v. City of McKeesport, 807 F.2d 49, 52-54 (3d Cir. 1986), cert. denied, 481 U.S. 1049 (1987); Northeast Women's Center v. McMonagle, 889 F.2d 466, 474-75 (3d Cir. 1989), cert. denied, 494 U.S. 1068 (1990). However, before considering the legal propriety of the district court conducting a proportionality analysis, we must first determine the significance of the court's statement. This statement, standing alone, is somewhat ambiguous. On the one hand, it can certainly be read, as Mr. Epstein does, as suggesting that the district court was concerned with the ratio between the damages awarded Mr. Washington and the fees sought by Mr. Epstein and his colleagues, and that it cut down the fees accordingly. The statement could, on the other hand, reflect the court's opinion that Mr. Epstein failed to exercise "billing judgment." SeeHensley v. Eckerhart, 461 U.S. 424, 437 (1983) ("The applicant should exercise 'billing judgment' with respect to hours

worked").

There is some support for this alternative reading. The court's statement came directly after its conclusion that the figures presented by Mr. Epstein "are not merely excessive, they border on the outrageous." Memorandum at 7. After making this finding, the court went on to explain:

> If they were actually sent to a client who was expected to pay for them, the bill would possible [sic] result in that client either going bankrupt or, at a minimum, finding a new attorney. By any standard, requesting that this Court approve an expenditure of over $175,000 in fees to obtain a $25,000 verdict is nonsensical."

Id.

The court then cited the court's conclusion in Oliverregarding the same issue that "the petition tendered by plaintiff's counsel is woefully deficient of the billing judgment that should have animated its preparation." Id. (citing Oliver v. Bell, No. CIV. A. 92-751 (E.D. Pa. June 30, 1994) (Order Memorandum)).

Nonetheless, in light of the district court's earlier comment, made while discussing the history of the case, that "[h]aving won a verdict of $25,000, Washington's attorney . . . now asks that attorneys' fees be approved in excess of seven times the amount of that award, $175,987.50," Memorandum at 3, we find the interpretation suggested by Mr. Epstein persuasive, and conclude that the district court did consider proportionality as a factor in its analysis. The two comments taken together seem no accident.

We now turn to the legal propriety of the court's action. Our review of the jurisprudence commences with the edicts of the United States Supreme Court on the issue at hand. The preeminent case on the subject is City of Riverside v. Rivera, 477 U.S. 561 (1986). City of Riverside, however, offers no clear direction. Based on an analogy with private tort actions, the municipality-petitioner in that case had suggested that attorney's fees in civil rights lawsuits "should be proportionate to the amount of damages a plaintiff recovers." Id. at 573 (Brennan, J., plurality). Justice Brennan, writing for a plurality of four, rejected the analogy, noting that

> [u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. . . . Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards.

Id. at 574 (citation omitted) (emphasis added).

In other words, the monetary amount awarded to the plaintiff would not be an accurate measure of the success achieved by the attorneys in the case, and therefore attorney's fees assessed in proportion to the damage award would not adequately compensate the attorneys for their labor, which the plurality compared to that of a "private attorney general." Id. at 575 (citation

omitted).  The plurality concluded that "[a] rule of proportionality would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from the courts," id.at 578, and for this reason rejected such a rule.

Justice Powell concurred in the judgment, because he saw no basis to reject the district court's detailed findings of fact. But the emphasis of his concurrence was markedly different from that of the plurality opinion:

> Where recovery of private damages is the purpose of a civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought.  In some civil rights cases, however, the court may consider the vindication of constitutional rights in addition to the amount of damages recovered.

Id. at 585 (Powell, J., concurring in the judgment).  In a footnote that received substantial attention, the Justice added, "[i]t probably will be the rare case in which an award of privatedamages can be said to benefit the public interest to an extent that would justify the disproportionality between damages and fees reflected in this case."  Id. at 586 n.3.  Finally, then–Justice Rehnquist dissented, joined by three other Justices, including Chief Justice Burger, who also wrote a separate dissent.

Shortly after the Supreme Court issued its opinion, this Court tackled the difficult task of sorting through City of Riverside's muddled outcome in Cunningham v. City of McKeesport, 807 F.2d 49 (3d Cir. 1986), cert. denied, 481 U.S. 1049 (1987) [hereinafter Cunningham II].  After noting that "the Supreme Court plurality rejected a proportionality rule," id. at 52, we considered what import to give to Justice Powell's concurrence:

> . . . Justice Powell's opinion might be read to suggest that disproportionality justifies a negative multiplier.
>
> We refrain from inferring such a view from City of Riverside, however.  First, this interpretation represents at most the view of a lone Justice and was not endorsed by any of the other eight. . . .  Second, we have doubts about Justice Powell's statement that only the rare case justifies disproportionate fee awards.  The facts of City of Riverside seem similar to those of a number of  1983 cases that we have seen. . . .  Finally, we consider application of Justice Powell's reasoning problematic.  The opinion sets out no method or standards by which a court might calculate the public interest served by a case, evaluate that interest in light of a disproportionality between damages and fees, and eventually settle upon a particular negative multiplier.  In the absence of an explicit mandate, we are reluctant to begin the difficult task of developing standards by which we might incorporate proportionality principles into the

attorney's fee calculus.
Cunningham II, 807 F.2d at 53-54 (footnote omitted); see alsoNortheast Women's Center, 889 F.2d at 474-75 (noting that the "Supreme Court in City of Riverside [rejected] the proportionality rule in the civil rights context.").

For the reasons articulated by the plurality in City of Riverside and by this Court in Cunningham II, we hold today that a court may not diminish counsel fees in a section 1983 action to maintain some ratio between the fees and the damages awarded. This is not to say that the amount of damages is irrelevant to the calculation of counsel fees. To the contrary, we recently recognized that "the amount of the compensatory damages award may be taken into account when awarding attorneys' fees to a civil rights plaintiff." Abrams v. Lightolier, 50 F.3d 1204, 1222 (3d Cir. 1995). But as the context of our statement in Abrams makes clear, the reason why the damage amount is relevant is not because of some ratio that the court ought to maintain between damages and counsel fees. Rather, the reason has to do with the settled principle, which we discuss hereinafter, that counsel fees should only be awarded to the extent that the litigant was successful. The amount of damages awarded, when compared with the amount of damages requested, may be one measure of how successful the plaintiff was in his or her action, and therefore "may be taken into account when awarding attorneys' fees to a civil rights plaintiff." Id.

The County Court attempts to refute Mr. Epstein's arguments on two grounds. First, it argues that the district court did notapply a "strict proportionality test": "[h]ad the lower court followed the strict 'proportionality' rule discussed in Abrams, the court would not have awarded fees in excess of the damage award." Brief of Appellee at 23. By a "strict proportionality test," the County Court apparently refers to a rule whereby counsel fees cannot exceed the amount of damages awarded. This Court clearly rejected such a test in Abrams, 50 F.3d at 1222 ("there is no rule that the fees award may be no larger than the damages award") (citing Hensley v. Eckerhart, 461 U.S. 424 (1983)), and it is clear that the district court did not apply such a test. Today we embrace the broader proposition that the district court cannot adjust counsel fees to maintain a certain ratio between the fees and damages -- to insure, for instance, that fees not exceed three times the amount of damages. That is just the type of analysis into which the district court seems to have entered.

The second argument advanced by the County Court is that even if the district court did conduct a proportionality analysis (albeit not what it calls a "strict" one), it did so correctly. In support of this proposition, the County Court suggests that "[u]nder Hensley, the district court is required to consider 'the relationship between the extent of success and the amount of the fee award.'" Brief of Appellee at 23 (quoting Hensley, 461 U.S. at 438). But Hensley does not stand for the proposition that the court should adjust counsel fees to reflect a certain ratio between fees and damage awards; rather, it stands for the proposition, which we discussed in an earlier paragraph, that the

amount awarded in counsel fees should reflect the extent to which the litigant was successful.  See Hensley, 461 U.S. at 440 ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.") (emphasis added).

It is clear that the district court, in the disputed statement, concluded that it was "nonsensical" to award fees of $175,000 for a judgment of 25,000 because the request was disproportionate with what the court considered a more appropriate ratio.  (Indeed, the court turned to the "success" analysis substantially later in its opinion.)  We hold that the court's consideration of the proportionality of the damages to the fee award was legal error.  Therefore, as this legal error affected the district court's determination to "decrease the hours by one-half on the grounds that they are excessive and unreasonable," Memorandum at 8, we must remand to the district court for it to make only such part of that reduction as was not due to proportionality.  Above, we also concluded that we must remand this same determination so that any reduction due to specificity can also be eradicated.

### 4. Success

Finally, the district court diminished Mr. Epstein's counsel fees by another fifty percent on the basis that "Washington hardly won a decisive victory in this case."  Memorandum, typescript at 8.  As the court explained,

> Five of Washington's nine claims did not survive a summary judgment motion.  At the time of trial, Washington requested a total of $661,756.02 in damages, a figure which did not include mental anguish, punitive damages, and prejudgment interest, and also did not include the $103,000 Washington claimed in lost wages.  The jury ruled against his primary claim, racial discrimination, and awarded him what amounted to a nominal recovery of $25,000 on his retaliation claim.

Id.

In addition, the district court did not apply the reduction to the time spent in preparation of the fee petition, but fully disallowed time claimed for preparation of a motion to amend the judgment to this Court which was denied.  Id., typescript at 9.

Mr. Epstein contends that the court's analysis is based on a "clear error of law" because "by persuading the jury to find for the plaintiff on the racial retaliation claim, plaintiff prevailed on a central theory of his case."  Brief of Appellant at 30.  Mr. Epstein further argues that the initial claim of racial discrimination "was so clearly related to the winning claim, that as a matter of law, there can be no reduction of fees for the work done since the time was necessarily spent on both issues."  Id. at 30-31.  As he explains,

> [A]ll of the evidence that was produced regarding the race discrimination claim was necessary in the litigation of the retaliation claim.  The retaliation was undertaken to punish plaintiff for his assertion of race discrimination, and to properly show to the jury the nature of the retaliation, the full context,

including the alleged race discrimination, had to be proven.
Id. at 32.

Finally, Mr. Epstein argues that "the fact that the jury awarded $25,000 is not a proper basis for reducing the hours or the lodestar on the theory that the result was not a good one for the plaintiff."  Id.

We are unconvinced by Mr. Epstein's arguments.  It is well established that "the court can reduce the hours claimed by the number of hours 'spent litigating claims on which the party did not succeed and that were "distinct in all respects from" claims on which the party did succeed.'"  Rode, 892 F.2d at 1183 (quoting Institutionalized Juveniles v. Secretary of Public Welfare, 758 F.2d 897, 919 (3d Cir. 1985) (quoting Hensley, 461 U.S. at 440)).  Notwithstanding Mr. Epstein's contentions, we conclude that the district court did not commit error when it reduced Mr. Epstein's fees for his failure to prevail on one of his two central claims, that of discrimination.  In addition, the alleged relatedness between the two general claims is too tenuous to support a finding of error.  Therefore, we conclude that the court was well within its broad discretion when it discounted the fees by fifty percent for partial lack of success.

## IV. Conclusion

In light of the foregoing, we will vacate the district court's award of attorneys' fees and remand for further consideration consistent with this opinion.  In particular, we will vacate the district court's assessment of Mr. Epstein's hourly rate, and remand for a new calculation in accordance with this opinion; in addition, we will vacate the district court's reduction of the number of hours by one half for their being "unreasonable and excessive," and direct the court to consider anew whether that reduction is warranted in light of our decision.
Washington v. Philadelphia County Court of Common Pleas, No. 95-1613

ALDISERT, Circuit Judge, Concurring and Dissenting.

Following our seminal attorneys' fees cases in Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. (Lindy I) , 487 F.2d 161 (3d Cir. 1973), and Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp. (Lindy II), 540 F.2d 102 (3d Cir. 1976) (in banc), this court carefully articulated the standard of review in attorney's fees cases:

[A]n award of reasonable attorneys' fees is within the district court's discretion.  Thus our standard of review is a narrow one.  We can find an abuse of discretion if no reasonable man would adopt the district court's view.  If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its  discretion.  We may also find an abuse of

discretion when the trial court uses improper standards or procedures in determining fees, or if it does not properly identify the criteria used for such determination.

Silberman v. Bogle, 683 F.2d 62, 64-65 (3d Cir. 1982) (quotations and citations omitted); see also Deisler v. McCormack Aggregates Co., 54 F.3d 1074, 1087 (3d Cir. 1995). What divides this panel is not the selection of this standard of review as the governing legal precept; here, there are no competing precepts. SeeMajority typescript at 6 ("We review the reasonableness of an award of attorney's fees for an abuse of discretion.") (citation omitted). In agreement on the controlling major premise, then, we differ only as to what it means. Such interpretation, however, implicates questions of both legal philosophy and jurisprudence.

At bottom, this case is about whether an appellate court appreciates the allocation of competence between trial courts and reviewing courts. To be sure, statements of deference by appellate courts to district judges appear in this court's dispositions. See, e.g., Majority typescript at 6. But quoting a standard of review and respecting it are different matters. See, e.g., Majority typescript at 11-13, 17-25. We must be vigilant of this court's increasing proclivity to deny substituting its judgment for that of the district court, but then to proceed with the tack that it expressly renounces. In this regard I am reminded of Byron's account of Julia: "And whispering 'I will ne'er consent' -- consented." Byron, Don Juan, Canto I, St. 117 (quoted in R. Aldisert, The Judicial Process 717 (2d ed. 1996)).

I.

I first indicate those portions of the majority's opinion of which I am in accord. I agree that the district court did not clearly err in finding that the hours claimed by Mr. Epstein were "excessive and unreasonable." Majority typescript at 17. I also agree "that the district court was well within its broad discretion when it discounted the fees by fifty percent for partial lack of success." Majority typescript at 27.

Further, I agree that in light of the district court's reliance on the district court opinion, subsequently reversed by Griffiths v. Signa Corp., Nos. 94-2090 and 94-2091 (3d Cir. Nov. 30, 1995) (unpublished), we should remand for reconsideration of the attorney's reasonable hourly rate. Thus, I concur in the remand order.

Upon careful examination of the attorneys' time sheets, seeA91-A129, I too have trouble with the district court's conclusion that "[m]any of the hours set forth in the fee petition are not properly documented." Dist. Ct. Op. at 5. Indeed, I agree with the majority's reading of Rode v. Dellarciprete, 892 F.2d 1177 (3d Cir. 1990), which held that billing records such as those at issue here need not document "the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." Id. at 1190 (quotation and citation omitted); see Keenan v. City of Philadelphia, 983

F.2d 459, 473 (3d Cir. 1992); see also Majority typescript at 13–15. However, the statement of the district court giving rise to this discussion of specificity, reprinted in the margin, appears in a single paragraph of a much larger discussion under the heading "HOURS REASONABLY EXPENDED". That section of the district court opinion contained an independent alternative justification for reducing the number of hours -- "that many of the billable hours requested are redundant, unnecessary or excessive." Dist. Ct. Op. at 5. The majority has no quarrel with this alternative basis. See Majority typescript at 17 ("[W]e only review the court's finding that the hours claimed by Mr. Epstein are 'excessive and unreasonable' for clear error. While Mr. Epstein offers persuasive arguments to support the hours he and his colleagues spent on the various parts of the trial, we conclude that these arguments fall short of satisfying our exacting standard of review and therefore conclude that the district court's conclusion is not clearly erroneous."). Thus, although the majority remand based on the District Court's criticism of the specificity of the documentation, in light of the alternative justification for reducing the number of hours, I dissent from the remand order based on specificity.

## II.

I turn next to the majority's contention that the district court "diminish[ed] counsel fees ... to maintain some ratio between the fees and damages awarded." Majority typescript at 22. For the reasons that follow, I do not agree that the district court impermissibly considered the proportionality of the damages in diminishing the requested fee.

I turn first to the statement of the district court upon which the majority premise their reasoning. The district court stated that "requesting that this Court approve an expenditure of $175,000 in fees to obtain a $25,000 verdict is nonsensical." Dist. Ct. Op. at 7.

To be sure, this court has expressed serious concerns with the practice of limiting an award of attorneys' fees to maintain proportionality between the fees and the amount of damages awarded. See, e.g., Cunningham v. City of McKeesport, 807 F.2d 49, 53–54 (3d Cir. 1986), cert. denied, 481 U.S. 1049 (1987); Northeast Women's Center v. McMonagle, 889 F.2d 466, 474–75 (3d Cir. 1989), cert. denied, 494 U.S. 1068 (1990). Although the district court's statements, in and of themselves, have the potential of being interpreted as implying that the district court improperly reduced the fees to maintain proportionality, we must consider the context in which the district court made them.

The district court offered the "nonsensical" description after concluding that the fees submitted by Appellant "are not merely excessive, they border on the outrageous." Dist. Ct. Op. at 7. The district court explained that:

If the[se figures] were actually sent to a client who was expected to pay for them, the bill would possibl[y] result in that client obviously going bankrupt or, at a minimum, finding a new attorney.

Dist. Ct. Op. at 7. Accordingly, taken in context, the district

court's statement also reflects a determination that Appellant failed to exercise "billing judgment." See Hensley v. Eckerhart, 461 U.S. 424, 437 (1983) ("The applicant should exercise 'billing judgment' with respect to the hours worked."). Indeed, after making these statements, the district court added that "the petition tendered by plaintiff's counsel is woefully deficient of the billing judgment that should have animated its preparation." Dist. Ct. Op. at 7 (citing Oliver v. Bell, No. CIV. A. 92-751 (E.D. Pa. June 30, 1994) (Order Memorandum)).

The majority agree that alternate inferences can be drawn from the ambiguous statement of the district court. See Majority typescript at 18 ("The statement could, on the other hand, reflect the court's opinion that Mr. Epstein failed to exercise 'billing judgment.' There is some support for this alternative reading..."). Yet, given two reasonable interpretations of an ambiguous statement, the majority reject one reasonable interpretation, in favor of another reasonable interpretation. This a reviewing court may not do. Indeed, "[i]f reasonable people could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Deisler, 54 F.3d at 1087 (quotation and citation omitted).

Moreover, even using the majority's preferred reasonable interpretation of the district court's statement, the majority do not identify how the district court deployed the forbidden ratio. And indeed, even after the reductions, the fee awarded by the district court still exceeded the damages by a ratio of 1.216 to 1 ($30,389.63 to $25,000.00). This hardly bespeaks a rigid mathematical calculation by the district court.

Furthermore, the majority construct an unworkable -- if not implausible -- schemata for determining attorneys' fees. They condemn any relationship between fees and recovery, while making it clear that the relationship between fees and recovery remains extremely relevant in considering the plaintiff's success. SeeMajority typescript at 23; see also Lindy I, 487 F.2d at 168 ("In evaluating the quality of an attorney's work in a case, the district court should consider ... the amount of recovery obtained."). Although the majority purport to announce a new rule of law that forbids consideration of proportionality between the damage award and attorneys' fees, the currency value of this initial public offering is seriously discounted by recognizing that at least three clear exceptions inhere in it: one, in measuring success, see Abrams v. Lightolier, 50 F.3d 1204 (3d Cir. 1995); Majority typescript at 22; two, when considering billing judgment, Hensley v. Eckerhart, 461 U.S. 424 (1983); and three, as recounted above, in evaluating the quality of an attorney's work.

Thus, the majority's new offspring is born with at least three bar sinisters on its escutcheon, and staggering through its uneasy fledgling steps, will no doubt cause confusion within district courts and, most assuredly, will generate litigation. Especially troubling here is that the majority fail even to disclose where or how the district court employed a proportionality ratio. To borrow from Lord Devlin, "I confess

that I approach the investigation of this legal proposition with a prejudice in favour of the idea that there may be a flaw in the argument somewhere." St. John Shipping Corp. v. Joseph Rank, 1 Q.B. 267, 282 (1957). Accordingly, I dissent in all respects from the majority's conclusion on proportionality.

                              III.
     I do not come as a stranger to attorney fee jurisprudence in this court. Twenty years ago, I authored the in banc opinion in Lindy II, wherein I stated the views of our court at that time:

> We find it necessary also to observe that we did not and do not intend that a district court, in setting an attorneys' fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It was not and is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief. Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work.

Lindy II, 540 F.2d at 116.

     Whatever had been the intention of the full court in 1976, the history of the past decades demonstrates that our district judges today have "become enmeshed in a meticulous analysis of every detailed facet of the professional representation," as evidenced by the opinions in this case. So also this court has become enmeshed. Perhaps the time has arrived for us to have the full court revisit basic concepts of our attorneys' fees jurisprudence in order to furnish clearer guidance, and hopefully, minimize the atrocious fulmination of these cases, here and in the district court.

     Drawing from my personal experience of almost 30 years on this court, and my current practice of sitting in three or four circuits each year, I beg indulgence to permit a personal expression of what troubles me in examining pertinent cases. Appellate courts seem to have lost respect for the narrow review encompassed in reviewing an exercise of discretion. Either because they have a hunger to get involved in the action, or because they disagree viscerally with fees set by the district courts, appellate judges introduce a devious device to broaden appellate review: new standards or criteria for district courts to follow meticulously.

     What has emerged is what Holmes called "Delusive exactness [,] a source of fallacy throughout the law." In this practice, newly created "standards and criteria" wag the tail of genuine exercise of discretion. And to argue against this, as I do, is to inveigh against Mom and Apple pie because everybody knows that "standards and criteria" are good for you. As indeed they are in most circumstances, but not if they destroy the exercise of discretion. These standards and criteria create an environment where an appeal is taken every time a district judge fails to kiss the book or to genuflect properly.

     Most importantly, appeals challenging deviations from these

standards and criteria arrive in the appellate court with a fundamental difference: the standard of review is not a limited review of exercise of discretion or the more restricted clear error, but plenary.  See Keenan v. City of Philadelphia, 983 F.2d 459, 472 (3d Cir. 1992) (the question of what standards to apply in calculating an award of attorney's fees is a legal question subject to plenary review).  Thus, instead of playing a limited role in the determination of attorneys' fees in limited review of discretion, the appellate courts, like the proverbial camel, have not only stuck their noses under the district courts' tent, but they are fully inside ranging around in turf that properly belongs to the district courts.

Almost 40 years ago a youthful Charles Alan Wright, America's premier federal courts expert, now president of the American Law Institute, wrote a very perceptive law review article entitled The Doubtful Omniscience of Appellate Courts in which he decried the development in "which trial courts [are] losing most of their power [and] the appellate courts have drawn unto themselves practically all the power of the judicial system."  Professor Wright noted:

> The principal consequences of broadening appellate review are two.  Such a course impairs the confidence of litigants and the public in the decisions of the trial courts, and it multiplies the number of appeals.... Every time a trial judge is reversed, every time the belief is reiterated that appellate courts are better qualified than trial judges to decide what justice requires, the confidence of litigants and the public in the trial courts will be further impaired. Under any feasible or conceivable system, our trial courts must always have the last word in the great bulk of cases.  I doubt whether there will be much satisfaction with the judgments of trial courts among a public which is educated to believe that only appellate judges are trustworthy ministers of justice.

I associate fully with Professor Wright's observations and find his commentary apropos and germane to current attorneys' fees jurisprudence.  I believe that we should return to the basic concepts of discretionary review we set forth in Lindy II: "If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion," 540 F.2d at 115, and cease the manufacturing of "standards and procedures" in order to bring about an abuse of discretion as a matter of law because the district courts failed, directly or indirectly, to cross every "t" and dot every "i" to the satisfaction of an appellate judge. We should free the district courts in attorneys fees cases from the solemn high mass ritual as is now required in the reception of guilty plea under Criminal Rule 11, or the judiciary's nit picking version of the USGA rules of golf---Sentencing Guidelines.  As Professor Wright comments, "If trial judges are carefully selected, as in the federal system, it is hard to think of any reason why they are more likely to make errors of judgment than are appellate judges."

Indeed, there are several reasons why district judges are much more capable of exercising broad discretion.  They are on the scene.  They smell the smoke of battle.  Indeed, Professor Maurice Rosenberg has identified four reasons that support vesting discretion in trial courts.  The first three are lesser reasons:

> One is the plain urge to economize on judicial energies. Appeal courts would be swamped to the point of capsizing if every ruling by a trial judge could be presented for appellate review.
> * * *

> A second reason is maintaining morale.  A trial judge ... would have an oppressive sense that appellate Big Brothers [and Sisters] were ever watching, peering over the trial bench, waiting for the harried and hurried trial judge to lapse into mortal fallibility.

> The third reason is ... finality.  The more reverse-proof the trial judge's rulings, the less likely the losing party is to test them on appeal and the sooner the first adjudication becomes accepted and the dispute tranquilized.

Maurice Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 Syracuse L. Rev. 635, 660–61 (1971).  Then follows what he calls the most pointed and helpful reason:

> [T]he superiority of his [or her] nether position. It is not that he [or she] knows more than his [or her] loftier [brothers and sisters]; rather [the trial judge] sees more and senses more.  In the dialogue between the appellate judges and the trial judge, the former often seem to be saying: "You were there.  We do not think we would have done what you did, but we were not present and we may be unaware of significant matters, for the record does not adequately convey to us all that went on at the trial. Therefore, we defer to you."

Id. at 663.  So long as the jurisprudence has conferred discretionary power in the district courts, we should respect it. We should not construct obstacles to its use in the form of artificial standards and criteria, the breach of which we deem an abuse of discretion as a matter of law, thereby creating a philosophical oxymoron by savaging traditional notions of discretionary powers.

It is for the foregoing reasons that I dissent from the majority approach, except in those areas set forth above, in which I concur.