**Valorie BURKS, et al.**

v.

**The CITY OF PHILADELPHIA and Richard Scott.**

**Civ. A. No. 95–1636.**

United States District Court, E.D. Pennsylvania.

Aug. 26, 1997.

**478**

Clifford A. Boardman, Philadelphia, PA, for plaintiffs.

E. Jane Hix, Asst. City Solicitor, Philadelphia, PA, Raymond A. Kresge, Jessamyne M. Simon, Klett Leiber Rooney & Schorling, Philadelphia, PA, for defendants City of Philadelphia, Richard Scott, individually and on behalf of the City of Philadelphia.

Raymond A. Kresge, Klett Leiber Rooney & Schorling, Philadelphia, PA, for respondent HIV Community Planning Group.

### MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are Defendant Richard Scott's renewed motion for judgment as a matter of law, and separate motions for attorney's fees and costs filed by Plaintiffs and Defendants. For the reasons stated below, Scott's motion will be granted in part and denied in part, Plaintiffs' motion for attorney's fees will be granted in part and denied in part, and Defendants' motion for attorney's fees will be denied.

## I. BACKGROUND

This case involves a variety of claims alleging that Scott made racially discriminatory employment decisions while he was Director of the AIDS Activities Coordinating Office ("AACO") of the City of Philadelphia in 1993 and 1994.[1] Plaintiffs[2] are eight African–Americans who applied for AACO positions or worked at AACO under Scott, who is white.

On March 21, 1995, Plaintiffs filed a Complaint setting forth claims under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and 42 U.S.C. §§ 1981 and 1983.[3] At a hearing in December 1996, Plaintiffs informed the court and opposing counsel that they were pursuing the following specific claims:

1. Burks, Mills, Sewell, and Young claimed discrimination regarding the temporary appointment of Kevin Green ("Green") to Public Health Program Analysis Supervisor—AIDS (Counseling and Testing) ("C & T Supervisor").

2. Burks, Hodges, Mills, and Sewell claimed discrimination regarding the permanent appointment of Green to C & T Supervisor.

3. Burks and Young claimed discrimination regarding the appointment of Jennifer Kolker ("Kolker") to a contract position that included at least some of the duties of the Director of Policy and Planning (the "Kolker position").

4. Sewell claimed discrimination regarding her denial of the job of Public Health Program Analyst ("Program Analyst").

5. Valentine claimed discrimination regarding his assignment as a Program Analyst at the AACO prison unit on the ground that the duties he was given were different from those given to other Program Analysts.

---

1. AACO is a division of the Department of Public Health that receives, distributes, and monitors funds intended to be spent locally on HIV- and AIDS-related services.

2. The plaintiffs are Valorie Burks, Veronica Hodges, Marcella B. Mills, Linda Robb, James Roberts, Noelle E. Sewell, David L. Valentine, and Terence Young. The defendants are Richard Scott and the City of Philadelphia. Throughout this Memorandum, the court will refer to individual parties by their surnames, to the plaintiffs collectively as "Plaintiffs," to the defendants jointly as "Defendants," and to the City of Philadelphia as "the City."

3. On September 27, 1995, the court *sua sponte* dismissed the Complaint because it violated Federal Rule of Civil Procedure 8(a)(2)'s requirement that it contain "a short and plain statement of the claim." *Burks v. City of Philadelphia*, 904 F.Supp. 421, 423–24 (E.D.Pa.1995). On October 12, 1995, Plaintiffs filed a "Simplified Complaint Pursuant to Court Direction." After the court noted that the pleading was improperly titled, Plaintiffs filed an "Amended Complaint" on February 14, 1996.

6. Robb claimed discrimination on the ground that most or all of the duties of her supervisory AACO position were eliminated.

7. Roberts claimed discrimination on the ground that he was stripped of subordinates and work responsibilities and that his project initiatives were repeatedly halted or rejected.

8. Hodges claimed discrimination regarding an attempt to transfer her from a position at a health center to the AACO prison unit.

9. Burks, Mills, Robb, Roberts, and Young claimed that they were subjected to a hostile work environment.

Plaintiffs sought compensatory and punitive damages, attorney's fees, and reinstatement of their previous positions, where applicable. Throughout the case, Scott denied the allegations, asserting that he chose the most qualified persons for each job and never treated Plaintiffs differently from similarly situated white persons.

After a year of discovery, on December 30, 1996, the court granted Defendants' motion for summary judgment on the Title VI claims and Hodges' attempted transfer claim. *Burks v. City of Philadelphia*, 950 F.Supp. 678 (E.D.Pa.1996). On January 31, 1997, the court granted the City's motion for summary judgment on the ground that Plaintiffs had not proven that the alleged discrimination was pursuant to a municipal custom or policy. *Burks v. City of Philadelphia*, No. 95–1636, 1997 WL 45031 (E.D.Pa. Jan. 31, 1997).

The case was called for trial on April 25, 1997. After Plaintiffs offered their evidence, Scott moved for judgment as a matter of law on all claims. The court granted the motion only as to the permanent C & T Supervisor job and punitive damages claims.[4] On May 22, 1997, after thirteen days of testimony and argument, the jury began deliberations. The next day, it returned a verdict in favor of Scott on the claims regarding the Kolker and Program Analyst positions and on Valentine's claim. As to the temporary C & T Supervisor position, the jury found that Scott intentionally discriminated against Burks and

Young on the basis of their race, and awarded them $5,000 each for emotional distress and Young an additional $6,000 for lost earnings. The jury also found in favor of Robb and Roberts on their claims and awarded them $5,000 each for emotional distress. The Judgments were entered on May 27, 1997.

On June 10, 1997, Scott filed a renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), seeking to set aside the jury's verdict as to the claims of Burks, Young, Robb, and Roberts. Plaintiffs and Defendants also moved under Rule 54(d) for attorney's fees pursuant to 42 U.S.C. § 1988. Additionally, Defendants moved for attorney's fees from Plaintiffs' counsel under 28 U.S.C. § 1927. The parties have filed responses and supplemental briefs supporting their respective positions, and the motions are ripe for determination.

## II. *SCOTT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW*

Scott's Rule 50(b) motion seeks to set aside the jury's verdict on all issues resolved adversely to him. The motion is based on three grounds. First, he argues that Robb and Roberts did not establish prima facie cases of employment discrimination. Second, Scott contends that there was no basis for the jury to infer that his proffered nondiscriminatory reasons for the employment decisions were a pretext for intentional race discrimination. Third, he asserts that the compensatory damages awards to Robb, Roberts, Young, and Burks should be vacated because they are too speculative, and because Burks' award cannot be traced to Scott's discrimination. Plaintiffs respond to these arguments in a fifty-three page brief with extensive references to the testimony at trial.

### A. *The Applicable Legal Standard*

■ A court may grant a motion for judgment as a matter of law if "a party has

---

4. Before trial, the court dismissed the hostile work environment claims on the ground that

they were not pleaded.

been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). The United States Court of Appeals for the Third Circuit has set forth the standard for when a court may grant a renewed motion for judgment as a matter of law under Rule 50(b):

> 'Such a motion should be granted only if, in viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.'

*McDaniels v. Flick,* 59 F.3d 446, 453 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996) (quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993)) (citations omitted). A court may grant a Rule 50(b) motion only when, "without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A James W. Moore, *Federal Practice and Procedure* ¶ 50.07[2], at 50–76 (2d ed.) (footnote omitted). To prevail on such a motion, however, the moving party must have moved for judgment as a matter of law before the close of all of the evidence. *See* Fed.R.Civ.P. 50(b).

## B. *Prima Facie Cases of Employment Discrimination*

The parties agree that to establish a prima facie case of employment discrimination, a plaintiff must prove four elements: (1) he or she is a member of a protected class; (2) he or she performed the job satisfactorily; (3) the employee suffered a material adverse employment action; and (4) a similarly situated non-member of the protected class was treated more favorably. The first two elements are not in dispute. Scott argues only that Roberts and Robb did not satisfy the third and fourth elements. (Def.'s Mem. Supp. J. as a Matter of Law at 3–14.)

### 1. James Roberts and Linda Robb

A reasonable jury could have interpreted the evidence at trial as follows. Roberts was in charge of AACO's Education and Prevention Unit, and Robb managed the AIDS Agency Services Unit (later named the Care Services Unit) when Scott became the agency's Director. Robb, Roberts, and managers of the other AACO units comprised the agency's senior staff, which met weekly with the Director to discuss policy issues and other important agency matters.

During the relevant time period, Scott transferred Roberts' responsibility for an adolescent prevention program for the Philadelphia schools to an organization operated by white persons. He stripped Roberts of his responsibility over training in counseling and testing of several community-based organizations, and gave those duties to Green, a white male. He reassigned to Green two of Roberts' subordinates, at least on a part-time basis. He moved Roberts' office to a place where he could not have private meetings. Scott also abruptly halted or rejected several education initiatives and programs that Roberts had developed, and refused to let Roberts attend senior staff meetings beginning in October 1994.

At the same time, Scott stripped Robb of her secretary, supervisory responsibility, contract monitoring responsibility, and participation in senior staff meetings. Robb repeatedly requested a clarification of her duties, but never received a meaningful response. Scott prohibited her from providing African–American community-based organizations with funding information. He ordered Robb to train Green and said he would hold her responsible for Green's mistakes. He also moved her office to a less private area and, on one occasion, falsely told her that she was "hated by the minority community."

While Scott was stripping the responsibilities and status of Roberts and Robb, he vested white employees with greater policy-making and senior supervisory authority. He installed Green as C & T Supervisor and ensured that he would remain in a senior staff position by giving him some of Robb

and Roberts' responsibilities and subordinates. He then directed Robb to train Green. He gave John Cella, who is white, the other duties formerly held by Robb. Further, Scott ensured that a white person would fill a third AACO management position when he appointed Kolker to a contract position that included responsibility for some of the duties of a vacated senior staff position called Director of Policy and Planning. Rather than open the vacated position to applicants, including African–Americans, Scott hired Kolker in a process that required no application process.

Viewing the evidence in the light most favorable to Robb and Roberts, it is clear that Scott successfully eliminated all of the significant responsibilities from these unit managers. Not only did he strip Robb and Roberts of substantive job duties, he humiliated them in front of their peers by treating them as if they were rank-and-file AACO staff members. There is no question that there was substantial evidence from which the jury could conclude that Scott stripped Robb and Roberts of significant job responsibilities and other indicia of their senior staff status because of their race.

■ Federal courts have held such conduct to be an adverse employment action. *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993) ("A materially adverse employment action may be indicated by ... significantly diminished material responsibilities, or other indices that might be unique to a particular situation."); *Parks v. University of Chicago Hosps. and Clinics*, 896 F.Supp. 775, 781 (N.D.Ill.1995); *cf. Darnell v. Campbell County Fiscal Ct.*, 731 F.Supp. 1309, 1313 (E.D.Ky.1990), *aff'd*, 924 F.2d 1057 (6th Cir.1991) (stating that "a transfer involving loss of prestige or an objectively demeaning change of working conditions—such as removal from a private office" can qualify as an adverse employment action). The court concludes that Robb and Roberts have satisfied the third element of a prima facie claim of employment discrimination.

As to the fourth element, there was ample evidence from which the jury could conclude and infer that white employees who were

similarly situated to Robb and Roberts were treated more favorably by Scott. Scott never removed subordinates or responsibilities from white AACO unit managers. Instead, he gave to Green and Cella the authority and subordinates that he took from Robb and Roberts.

Because the court concludes that Robb and Roberts satisfied the third and fourth elements of a prima facie claim of employment discrimination, the court will deny Scott's motion on this ground.

## C. *Scott's Proffered Non–Discriminatory Reasons as Pretext*

Scott argues that Robb, Roberts, Young, and Burks did not satisfy their burden of establishing that Scott's proffered nondiscriminatory reasons were a pretext for intentional race discrimination. (Def.'s Mem. Supp. J. as a Matter of Law at 14–16.)

■ Once a plaintiff has made out a prima facie case of employment discrimination, the defendant must come forward with some evidence that it took its actions for legitimate, non-discriminatory reasons. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). If the defendant offers such evidence, the burden returns to the plaintiff to prove by a preponderance of the evidence *"both* that [the employer's] reason was false, *and* that discrimination was the real reason" for the adverse employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). The Third Circuit has held in the analogous summary judgment context that, to defeat an employer's proffered reason for an employment action, the claimant

> must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ... that a reasonable factfinder *could* rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

*Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994) (citations omitted).

There was substantial evidence from which a reasonable jury could conclude that Scott's reasons for his employment actions against Burks, Robb, Roberts, and Young were unworthy of credence, and that intentional race-based discrimination was the true reason for those actions. Plaintiffs offered ample evidence in this regard. Plaintiffs and others testified about Scott's comments during his AACO directorship that reflected a disrespectful and demeaning attitude toward African–Americans. Plaintiffs' witnesses also testified that Scott had an agenda of diluting the authority of African–Americans at AACO, while giving less-qualified white employees better work assignments and greater responsibility.

The evidence in this regard is too voluminous to list here because it deals with specific events and the inferences that reasonably can be drawn therefrom. It is enough to say that the jury reasonably could have concluded that Scott's explanations for hiring Green as C & T Supervisor and for stripping authority from Robb and Roberts, were a pretext, and that the true reason for those actions was intentional racial discrimination. The court will deny Scott's motion on this ground.

### D. *The Compensatory Damages Awards*

Scott makes two arguments supporting his request that the court set aside the jury's compensatory damages awards. He first contends that neither Burks, Robb, Roberts, nor Young presented sufficient evidence at trial of actual injury as a result of Scott's discrimination to support an award for damages for emotional distress. (Def.'s Mem. Supp. J. as a Matter of Law at 16–17.)

■ The Third Circuit has held that damages in employment discrimination cases may not be presumed and that speculative damages may not be awarded. *Gunby v. Pennsylvania Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir.1988), *cert. denied*, 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). However, damages for emotional distress may be awarded if there is sufficient evidence to support the award. *Id.* A plaintiff's testimo-

ny regarding evidence of his or her mental distress, without more, is sufficient to recover damages under 42 U.S.C. § 1983. *Bolden v. Southeastern Pa. Transp. Auth.*, 21 F.3d 29, 34 (3d Cir.1994).

■ In this case, Burks, Robb, Roberts, and Young testified (tearfully, at times) that they were extremely upset as a result of Scott's employment actions. They generally testified that their diminished responsibilities and prospects of promotion at AACO made them feel humiliated in the workplace, among their personal and professional acquaintances, and in the African–American AIDS services community, which they had dedicated their careers to serve. The court concludes that Burks, Robb, Roberts, and Young presented direct and substantial evidence of humiliation and emotional injury, and that the compensatory damage awards should be sustained on this ground.

Scott's second argument concerns the jury's award of $5,000 in damages to Burks for emotional distress. *Id.* at 18–19. When the court was preparing the jury interrogatories, Scott argued that only the candidate who would have obtained the job in the absence of discrimination should be eligible to receive damages for emotional suffering. The court rejected this argument and agreed with Plaintiffs that if Scott engaged in racial discrimination against any applicant, he should be liable for all damages flowing from this wrong. The court believed that this position was more consistent with the notion that "the basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of their constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). At the time, Scott had not presented the court with legal authority that specifically supported his position.

The jury interrogatories first asked whether Scott intentionally discriminated against Burks, Mills, Sewell, or Young with regard to the temporary C & T Supervisor job. The jury checked the "YES" box next to Burks and Young and then stated that each had proven $5,000 in emotional distress as a result. The jury then was asked to identify the

candidate that would have received the job absent such discrimination, and it checked the "YES" box next to Young. The jury awarded him $6,000 in lost earnings.

In his motion, Scott cites an Eighth Circuit case that stands for the rule that a plaintiff may not recover compensatory damages for pain and suffering if he or she would have suffered the same adverse employment action even in the absence of the defendant's intentional race discrimination. *Edwards v. Jewish Hosp. of St. Louis,* 855 F.2d 1345, 1352–53 (8th Cir.1988) (claim under § 1981). The court has found that the District of Columbia Circuit has followed the same general principle in the Title VII context. *See Bishopp v. District of Columbia,* 57 F.3d 1088, 1092–93 (D.C.Cir.1995). Although the court has turned up no Third Circuit case that is squarely on point, it believes that the court would follow the rule of the Eighth and District of Columbia circuits. Under these decisions, which the court is bound to follow, Burks' emotional suffering cannot be traced to Scott's discriminatory employment decision.

Accordingly, Scott's motion will be granted on this ground because the court should have given the jury the opportunity to award compensatory damages *only* to the single candidate who would have obtained the job. The jury found that Burks' denial of the temporary C & T Supervisor position would have occurred even in the absence of discrimination, and so the court must vacate the jury's award of $5,000 in compensatory damages to Burks.

### III. *MOTIONS FOR ATTORNEYS FEES UNDER 42 U.S.C. § 1988*

In an action to enforce a provision of 42 U.S.C. §§ 1981 or 1983, the court, in its discretion, may allow the prevailing parties a reasonable attorney's fee as part of the costs. 42 U.S.C. § 1988(b). All of the parties in this case assert that they are prevailing parties. Plaintiffs request $405,925 for attorney's fees and $32,452.30 for costs, for a total

of $438,377.30. Defendants request an attorney's fee of $302,771 under the statute.

The Supreme Court has held that parties are "prevailing" if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quotation omitted). The court finds that Burks, Robb, Roberts, and Young prevailed because the jury found that Scott discriminated against them.[5] Scott and the City prevailed on the remaining claims.

A prevailing party seeking attorney's fees must establish the reasonableness of its fee request by submitting evidence of the hours worked and the fee claimed. *Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir. 1990). The party opposing the award may challenge the reasonableness of the request with an affidavit or a brief with sufficient specificity to give fee applicants notice. *Id.* In considering the motion and the adverse party's objections, the district court has wide discretion to modify the award. *Id.*

The starting point in this analysis is to multiply the number of hours spent on the litigation by a reasonable hourly rate. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. The product, known as the lodestar, "provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Id.* The lodestar is presumed to be the reasonable attorney's fee contemplated by 42 U.S.C. § 1988(b). *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984); *Washington v. Philadelphia County Ct. of Common Pleas,* 89 F.3d 1031, 1035 (3d Cir.1996).

### A. *Plaintiffs' Motion for Attorney's Fees and Costs*

Plaintiffs' counsel of record asserts that he, two contract attorneys, and a law clerk spent 2,024 hours on this case. Specifically, he states that he spent 1,552 hours at $225 per hour, for a total of $349,200, contract attor-

---

**5.** The court will refer to Burks, Robb, Roberts, and Young collectively as the "Prevailing Plaintiffs."

neys Aaron Fultz (354 hours at $125 per hour, for $44,250) and Martin Sweet ("Sweet") (27 hours at $125 per hour, for $3,375) spent 381 hours at $125 per hour for a total of $47,625, and law clerk Glenn Randall spent 91 hours at $100 per hour, for a total of $9,100. These figures add up to a lodestar of $405,925.[6]

Defendants object to Plaintiffs' request for a rate of $225 per hour. The court must calculate an attorney's hourly rate according to the prevailing market rates in the community. *Washington*, 89 F.3d at 1035. Plaintiffs support their motion with sworn statements by three Philadelphia attorneys who practice civil rights litigation. (Pls.' Mem. Supp. Atty's Fees Exs. G, I, J.) William H. Ewing, Esquire, states that Plaintiffs' counsel's requested rate is "reasonable and within the range of customary market rates for attorneys of comparable experience to handle sophisticated federal litigation like this case...." (Ewing Decl. ¶ 7.) Alice W. Ballard, Esquire ("Ballard"), states that she is "aware of the quality of [Plaintiffs' counsel's] work from having worked or consulted with him on some of his cases in the past," and that $225 is low because it is based on his standard rate for non-contingent fee-paying clients. (Ballard Aff. ¶ 8.) Lorrie McKinley, Esquire ("McKinley"), the Chairperson of the Attorneys Fees Committee at Community Legal Services, Inc., states that her organization would charge $205 per hour for Plaintiffs' counsel's work, the median rate charged by area firms for lawyers with be-

tween eleven and fifteen years of experience. (McKinley Decl. ¶ 10.)

Defendants did not rebut these assertions with contradictory affidavits or other meaningful evidence. In this situation, the court may not exercise its discretion to reduce the requested rate. *Washington*, 89 F.3d at 1036. The court, however, is presented with two sworn statements that Plaintiffs' counsel's market rate is $225 per hour, and one stating it is $205. Given these competing rates, and based on the court's experience in observing trial lawyers in Philadelphia for more than twenty-five years, the court believes the $205 hourly rate is more reasonable for an attorney of Plaintiffs' counsel's caliber. The court has witnessed, with regret and disappointment, his uncooperative approach to the litigation, his failure on many occasions to adhere consistently to even the most basic rules of evidence and procedure, and his generally belligerent, aggressive, disrespectful courtroom demeanor. These unfortunate traits place him below the standard that this court expects from attorneys who practice before it.[7] The record is replete with examples of this behavior, many of which are cited by Defendants in their motion for attorney's fees. (See Defs.' Mem. Supp. Atty's Fees at 15–21.)

The court concludes that $205 is a reasonable fee for Plaintiffs' counsel, based on its experience and McKinley's affidavit.[8] His 1,552 hours, multiplied by the $205 hourly rate, yields a total of $318,160. The court will reduce the lodestar to $374,885.[9]

---

6. In all cases, the court has rounded off the number of hours to the nearest hour.

7. The court believes that Plaintiffs' counsel could be correct when he refers to himself as "the rare civil rights counsel," but he plainly exaggerates when he refers to himself as "a highly experienced civil rights advocate," and "a highly experienced and skillful civil rights attorney." (Pls. I Reply Mem. Supp. Atty's Fees at 15, 28.) The court attributes these self-serving statements to the irresistible tendency for some lawyers to exaggerate about their perceived litigation prowess when seeking an attorney's fee award.

8. The court recognizes that Ballard is a very respected Philadelphia civil rights attorney, and it does not ignore her statement that Plaintiffs' counsel's $225 rate is low. However, Ballard's affidavit reveals that she has not actually worked

closely with Plaintiffs' counsel on a complex case or lengthy trial over an extended period of time. Indeed, Plaintiffs' counsel told the court that this three-week trial was the longest of his career. The court has had the ability to observe and evaluate his performance over two and a half years. Having done that, it can accurately determine that an hourly rate of $205 is more reasonable than a rate of $225.

9. The court will reject Defendants' argument that Plaintiffs have not proven that the contract attorneys and law clerk's rates are too high because Defendants did not provide evidence or a convincing reason to reject Plaintiffs' counsel's sworn testimony on this point. (See Boardman Aff. ¶¶ 1–13.)

Defendants challenge Plaintiffs' request on six additional grounds. They argue that Plaintiffs (1) request fees for issues and claims on which they did not prevail; (2) "double-billed" for meetings and hearings; (3) request fees for excessive time spent by Plaintiffs' counsel on certain pleadings and court filings; (4) request fees for time spent on inappropriate or irrelevant matters; (5) have not satisfied the specificity requirement for fee motions; and (6) have submitted their costs in an unacceptable format and without documentation. The court will address each of these arguments separately.

### 1. Unsuccessful Claims

In this case, eight Plaintiffs alleged as many as four claims against two defendants under two different legal theories. Some of the claims were completely successful. Others were dismissed at the summary judgment stage and before trial. Still others were rejected during trial and in the jury's verdict. Yet, all eight Plaintiffs argue that they all were completely successful and are entitled to the entire lodestar amount.

The court has been closely presiding over this litigation for more than two years and is not surprised that Plaintiffs have adopted this stance. Like so many other positions Plaintiffs have taken, this broad-based, inarticulate position is absolutely no help to the court. The court expects a party seeking an attorney's fee to furnish genuine guidance to help the court wade through the complex shoals of fee setting toward the proper decision on attorney's fees.[10] Plaintiffs' oversized motion papers are so dominated by rhetoric and bombast that the truth and the pertinent facts are difficult to identify. These submissions include salvos leveled at opposing counsel, but he fails to recall that the closing statements are over, and the jury is long gone. The perplexing consequence of all of this is that the court must go back to the starting line in deciding this motion and determine, as best as counsel has allowed it to do, how much work was reasonably spent

to obtain whatever results the court determines were achieved.

In *Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), the Supreme Court emphasized that a plaintiff's entitlement to an attorney's fee under § 1988 must be proportional to the results obtained. As the Court said: "the most critical factor is the degree of success obtained." *Id.* at 436, 103 S.Ct. at 1941. The Court also noted that evaluating a plaintiff's success may be difficult in complex cases in which there are multiple claims that may or may not share facts and legal principles. When unrelated claims are brought against the same defendants, "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved." *Id.* at 435, 103 S.Ct. at 1940 (quotation omitted).

> In other cases, the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.*

With certain exceptions discussed below, the court finds that there is a mixture of related and unrelated claims. All of the claims feature related legal theories because they involved employment discrimination claims under the principles of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and related case law. All of the claims shared the same evidence to the extent that they required proof that intentional discrimination was the determinative factor in the adverse employment actions. On the other hand, the Title VI claims[11] were unique in that they

---

10. Defendants argue that Plaintiffs were 10% successful on their claims and that the court should reduce the lodestar by 90%. (Defs.' Mem. Opp. Atty's Fees at 11–12.)

11. Regarding the Title VI claims, the court notes that, on December 30, 1996, it entered summary judgment in favor of Defendants and against Robb and Roberts. The Amended Complaint,

were based largely on injuries to beneficiaries of federal funds. Furthermore, each set of claims relating to a separate adverse employment action were distinct because it centered around a discrete set of facts. Thus, while each claim was separate and distinct, it is apparent that there is significant overlap among all claims. The court will apportion these claims as to their prominence in the case and then decide what portion of the unsuccessful claims was reasonably necessary to achieve the results on the successful claims.

The court apportions the claims in this case as follows:

| | |
|---|---|
| Title VI (all Plaintiffs) | 15% |
| C & T Supervisor (temporary) (4 Plaintiffs) | 15% |
| C & T Supervisor (permanent) (4 Plaintiffs) | 10% |
| Kolker position (Burks and Young) | 10% |
| Program Analyst position (Sewell) | 10% |
| Valentine's disparate treatment claim | 10% |
| Roberts' demotion claim | 10% |
| Robb's demotion claim | 10% |
| Municipal liability (custom & policy) | 10% |

Four Plaintiffs claimed relief for the temporary C & T Supervisor job, and so Young and Burks each are entitled to one-fourth of the fifteen percent allocated to those four claims, or 3.75% each. Robb and Roberts' claims are allocated ten percent each. Thus, the successful claims in this litigation amounted to 27.5% and the unsuccessful claims amounted to 72.5%.

A substantial portion of the work devoted to the unsuccessful claims was also applied to the Prevailing Plaintiffs' successful claims. For example, Burks and Young's unsuccessful claims regarding the Kolker position led them to evidence from which they could argue that Scott's motives were discriminatory. Valentine's claim involved similar evidence of Scott's motivation. From the court's understanding of the issues in the case, and after considering the parties' arguments, the court concludes that 27.5% of the work spent on unsuccessful claims was reasonably related to the results achieved in this litigation. The court will add this amount to the successful claims for a fifty-five percent success.

Defendants correctly point out that Plaintiffs sought $100,000 each in compensatory

damages in addition to punitive damages and equitable relief. (Pls.' Am. Pretrial Mem. at 30.) Robb and Roberts were awarded $5,000 each and Young received $11,000. This award clearly was much less than Plaintiffs had sought before trial. The court will deduct an additional five percent to reflect this lack of success. See *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1222 (3d Cir.1995) (stating that "the amount of the compensatory damages award may be taken into account when awarding attorneys' fees to a civil rights plaintiff").

In summary, the court will reduce the adjusted lodestar of $374,885 by 72.5% to reflect the percentage of the claims on which they did not prevail. The court found that, of this reduction, 27.5% was reasonably related to the success achieved in the claims on which Robb, Roberts, and Young prevailed, and so it will include this portion as part of the successful claims. The court then will subtract an additional five percent to account for the lack of success on the claims for damages. Accordingly, the court will reduce the lodestar figure by fifty percent to reflect the time spent on unsuccessful claims. Thus, at this stage in the analysis, the lodestar figure is $187,442.50.

## 2. Double–Billing

Defendants argue that Plaintiffs double-billed on twenty days between May 28 and August 2, 1996. (Defs.' Mem. Opp. Atty's Fees at 3–4.) Plaintiffs' counsel's "meetings" log reveals that a consecutive string of computer entries show two entries for the same task for the same amount of time on the same day. (Pls.' Mem. Supp. Atty's Fees Ex. C.) He admits that he double-billed for four hours on June 19 and three hours on June 21. (Pls.' Reply Mem. Supp. Atty's Fees at 13.) He insists that the other entries are correct. *Id.* at 13–14.

For example, on May 28, Plaintiffs' counsel lists two separate staff meetings with Sweet, both of which lasted fifteen minutes. Two

---

however, states that all eight Plaintiffs had Title VI claims. (Am.Compl.¶¶ 22–23.) At the December 5, 1996, hearing (while the summary judgment motion was pending) Plaintiffs' counsel

stated that only Robb and Roberts were alleging Title VI claims. The court views this statement as a withdrawal of the other six Plaintiffs' claims.

days later, he lists two more staff meetings with Sweet, both of which lasted forty minutes. On June 6, he lists two client meetings, both of which lasted twenty minutes. On June 11, there are two more twenty-minute client meetings. This trend continues until the identical entries of August 2, which list two client meetings of twenty minutes each.

The court understands that it cannot find and Defendants can not prove that the listed meetings did not occur.[12] The chronic duplication, however, makes the request so suspect and unreliable that the court cannot approve it as being satisfactorily established. The court will subtract one of the two identical entries on each of fifteen days [13] for a total of 12.5 hours, and reduce the requested fee by $2,562.50.[14] This brings the lodestar to $184,880.

### 3. Excessive Time on Pleadings and Other Filings

Defendants argue that Plaintiffs' counsel spent excessive time on the following activities: (1) twenty-three hours to draft a complaint that was stricken by the court as too long and burdensome; (2) sixty-nine hours to prepare a pretrial memorandum; (3) twenty-two hours to draft a client representation letter; and (4) six hours to prepare for a court hearing. (Defs.' Mem. Opp. Atty's Fees at 13–14.) Defendants also argue that Plaintiffs' counsel spent excessive time on funding issues that were excluded by the court, and on hearings regarding medical authorizations and the exchange of trial exhibits. Id. at 14.

The court held that the 36–page, 128–paragraph Complaint contained "unnecessary, burdensome, and often improper argumenta-

tive detail," that it "reads more like a novel than the legal pleading it purports to be," and that it "improperly and amateurishly" repeated the same general allegation of bias. *Burks v. City of Philadelphia,* 904 F.Supp. 421, 424 (E.D.Pa.1995). The court struck the Complaint because it was a gross departure from Rule 8's requirement that it state a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* Because Plaintiffs' counsel spent more time than was reasonably necessary to write this overly lengthy Complaint, the court will deduct 12.5 hours at $205 per hour, or $2,562.50. The court also will subtract the twenty-five minutes, or $86.10, that he spent to file the "Amended Complaint," which replaced the second complaint that violated the Federal Rules of Civil Procedure because it was titled "Simplified Complaint Pursuant to Court Direction." *See* Fed.R.Civ.P. 7(a) (listing the names of the six pleadings).

The court will subtract two hours, or $410, that Plaintiffs' counsel spent at a hearing that was necessary only because he refused to produce medical authorizations or records after the court specifically ordered him to do so.

 The court cannot conclude that the sixty-nine hours to prepare the Pretrial Memorandum is excessive. The court was driven to rely heavily on that document to learn how Plaintiffs would present their case and so it could effectively manage the trial. Although the Pretrial Memorandum contained several serious deficiencies (i.e., substandard offers of proof and inclusion of irrelevant witnesses), the time spent on this filing was not otherwise unreasonable. The court reaches the same conclusion with respect to the time devoted to client meetings,

12. It is interesting that, of all of the duplicative entries, the only ones that Plaintiffs' counsel admits are wrong are two hearings that easily can be verified by persons other than Plaintiffs and their attorneys. All of the other double entries that Plaintiffs' counsel insists are correct are of the type that cannot be verified by anyone except Plaintiffs' counsel, his clients, and staff. ·

13. The court did not subtract fees based on entries that were not duplicative, such as when the time spent on each task was different. Such entries appear on July 6, 7, 11, 14, and 29.

14. This double-billing demonstrates that Plaintiffs made no meaningful attempt to responsibly exercise "billing judgment." *See Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. The Supreme Court has stated that the prevailing party's lawyer should "make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Id.* It is apparent that Plaintiffs' counsel made no such good-faith effort in this case.

preparing for a pretrial hearing, and drafting client representation letters.[15]

The court will subtract $3,058.60 from the requested attorney's fee on the ground that the time spent on various tasks was excessive. The lodestar is now at $181,821.40.

### 4. Time Spent on Inappropriate and Irrelevant Matters

Defendants argue that Plaintiffs' counsel spent excessive time talking with lawyers for a plaintiff in a separate civil action and with persons who were named as witnesses, but excluded by the court at trial. The court has read the parties' submissions on this issue and, with one exception, will not reduce the requested fees on these grounds. The court will subtract fifteen minutes for Plaintiffs' counsel's telephone call to the lawyers in the other case on the day after the judgments were entered in the case. The court will deduct $51.25 for that call and reduce the lodestar to $181,770.15.

### 5. Lack of Specificity

Defendants argue that Plaintiffs' motion is not specific enough because it contains general entries such as "client meeting" and "review documents." Plaintiffs' counsel has submitted contemporaneous daily time logs listing the particular task and the time spent on it. Except for the suspect double-billing, the descriptions of the tasks are sufficiently specific for Defendants to challenge the requested fees and for the court to determine whether the time spent on each task is reasonable. The court will deny Defendants' motion on this ground.

### 6. Documentation of Costs

Defendants argue that Plaintiffs' requested costs are in a three-page summary format, not in the Bill of Costs format. They also state that Plaintiffs initially did not submit invoices, bills, or receipts to support their request for $32,452.30 in costs, and that most of the entries list costs that are not recoverable. On July 23, 1997, Plaintiffs supplement-ed their motion with about seventy-five pages of invoices and receipts.

As an initial matter, the court will reduce the request for costs by ten percent, or $3,245.23, because it is organized in a fashion that makes it more difficult to adjudicate their request. Plaintiffs simply have bound together a batch of receipts and handed them to the court *en masse* to sort out. The exhibits are not grouped together in an understandable format, such as by date or subject matter. The court once again (after reminding itself of its goal of assuring that Plaintiffs' and Defendants' interests are to be protected) is left to fend for itself in this new adventure of trying to determine if the requested costs can somehow be verified as lurking in this extraordinary offer of evidence.

The court agrees with Defendants' argument that a different variety of double-billing emerges in the effort by Plaintiffs to seek attorney's fees for time spent on the case by Sweet and, at the same time, reimbursement of Plaintiffs' counsel's weekly payments to Sweet. The court will reject the request for costs for all of the checks to Sweet and other staff, a total of $3,633.97. The court also will subtract an April 3, 1996, entry for $12.80 in "costs" on the ground that it is too vague. Thus, the court will subtract $6,892 and award the Prevailing Plaintiffs $25,560.30 for costs in this case.

### 7. Summary

 Plaintiffs' motion sought fees in the amount of $405,925. The court first found that Plaintiffs' counsel is entitled to an hourly rate of $205 per hour, rather than $225 per hour, and adjusted the lodestar to $374,885. The court reduces this amount by fifty percent to account for claims on which Plaintiffs were unsuccessful, and lowers the lodestar accordingly to $187,442.50. The court then subtracts $2,562.50 for double-billing, $2,648.60 for excessive time on the Complaint, $410 for time spent at a hearing on medical authorizations, and $51.25 for a post-trial telephone call to another lawyer. After

---

15. As for Defendants' argument that Plaintiffs devoted too much time to funding issues, the court considered this argument as part of its analysis of the portion of unsuccessful claims that were reasonably related to the successful claims.

these deductions, the court finds that a reasonable attorney's fee for the Prevailing Plaintiffs is $181,770.15.

Plaintiffs also submitted a request for $32,452.30 in costs related to this lawsuit. The court reduces the costs by ten percent, or $3,245.23, to account for the primitive format in which the verification was presented. The court also reduces the costs by $3,633.97 to account for improper billing of a contract attorney, and by $12.80 due to the vague description of costs. The court will award the Prevailing Plaintiffs costs in the amount of $25,560.30.

The court also will apportion the $207,330.45 in fees and costs among the Prevailing Plaintiffs based on the above-described allocation of the prominence of the claims in the case. As stated above, Robb and Roberts' claims each comprised ten percent of the case, and Burks and Young's claims concerning the temporary C & T Supervisor position were each allocated at 3.75%. The court will adjust Young's claim to five percent, and Burks' to 2.5%, to reflect the fact that Young received compensatory damages, and Burks did not. Based on this formula, the court will award Robb and Roberts 36.4% of the award and costs, or $75,468.28 each, Young 18.2% of the award and costs, or $37,734.14, and Burks nine percent of the award and costs, or $18,659.75. Plaintiffs' motion will be granted in part and denied in part.[16]

### B. *Defendants, Motion for Attorney's Fees*

The court now will turn to Defendants' request for $302,771 in attorney's fees under 42 U.S.C. § 1988.[17] As stated in the preceding section, Scott and the City were the prevailing parties on all but four claims in this case. They prevailed on Mills and Sewell's claims regarding the temporary C & T Supervisor job; Burks, Hodges, Mills, and Sewell's claims regarding the permanent C & T Supervisor job; Burks and Young's claims regarding the Kolker position; Sewell's claim regarding the Program Analyst position; Valentine's claim concerning his work assignments; Hodges' claim regarding an attempted transfer; all claims against the City; all claims for punitive damages and equitable relief; and all Title VI claims.

A litigation victory in a § 1981 or § 1983 claim, without more, does not entitle a prevailing defendant to an attorney's fee under § 1988. A party who successfully defends a claim is entitled to a reasonable attorney's fee under the statute only if the plaintiff's claim is " 'frivolous, unreasonable, or groundless, or [when] the plaintiff continued to litigate after it clearly became so.' " *Commonwealth v. Flaherty*, 40 F.3d 57, 61 (3d Cir.1994) (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978)); *see also Hensley*, 461 U.S. at 429 n. 2, 103 S.Ct. at 1937 n. 2 ("A prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant.").

In their motion, Defendants contend that six categories of claims were frivolous or unreasonable.[18] The court is familiar with all of these claims and concludes that some of them may have been very weak, but none of them were unreasonable or baseless. The court notes that the Title VI claims were not supported by basic legal principles, and thus was doomed from the outset, because Plaintiffs sought relief for injuries to the beneficiaries of federal funding and had no standing to pursue relief for those injuries. However, the Title VI regulatory

---

**16.** Accordingly, Plaintiffs' Motion to Supplement Their Motion and Petition for Attorneys' Fees and Costs Pursuant to 42 U.S.C. § 1988 will be granted in part and denied in part. The court considered the merits of that motion as part of the above analysis of the attorney's fees and costs issues.

**17.** Defendants assert that they devoted 2,691 hours to this litigation at $150 per hour, for a lodestar of $403,695. They have subtracted 25% of this amount, or $100,924, to account for

claims on which Plaintiffs prevailed. (Defs.' Mot. Supp. Atty's Fees ¶¶ 10–11.)

**18.** These six claims are: the Title VI claims, all claims against the City, Hodges' attempted transfer claim, the permanent C & T Supervisor claims, the punitive damages claim against Scott, and the continued pursuit of equitable relief after the dismissal of the City. (Defs.' Mem. Supp. Atty's Fees at 29.)

scheme is somewhat confusing and Plaintiffs' argument may have been imaginative, but it was not frivolous.

The same reasoning applies to Plaintiffs' attempt to establish municipal liability. They had only a shadow of evidence to support their claim that the discrimination in the case was the product of the City's custom or policy. The court believes that this was not a near miss and that summary judgment was clearly warranted in favor of the City, but it cannot characterize the claim as frivolous or unreasonable. The court has evaluated Defendants' arguments as to the other claims and concludes that they were not frivolous, groundless, or unreasonable. For these reasons, the court will deny Defendants' motion for attorney's fees under 42 U.S.C. § 1988(b).

## IV. DEFENDANTS' MOTION FOR FEES AND COSTS UNDER 28 U.S.C. § 1927

Defendants also seek an award of $100,874, representing twenty-five percent of their lodestar, under 28 U.S.C. § 1927. They argue that an award of attorney's fees under this section is warranted due to Plaintiffs' counsel's unprofessional conduct during discovery and at trial. (Defs.' Mem. Supp. Atty's Fees at 30–32.) Plaintiffs' counsel denies that he engaged in the behavior of which he is accused and stresses that he violated no rule of professional conduct. (See Pls.' Mem. Opp. Atty's Fees at 15–23.)

■ A court may order an attorney who "multiplies the proceedings in any case unreasonably and vexatiously" to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. A finding

of willful bad faith by the offender is a prerequisite for imposing fees under this provision. *Hackman v. Valley Fair*, 932 F.2d 239, 242 (3d Cir.1991); *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1358 (3d Cir. 1990). Once a finding of bad faith has been made, the district court must determine whether sanctions are appropriate. *Hackman*, 932 F.2d at 242; *Ford v. Temple Hospital*, 790 F.2d 342, 347 (3d Cir.1986).

■ In the overwhelming majority of instances when Plaintiffs' counsel engaged with the court on paper and in person, he pushed his self-perceived role of advocate to the near breaking point as respects civility, professionalism, and plain good manners.[19] Despite the many instances when the court expressed its disappointment with Plaintiffs' counsel's performance, the court cannot conclude that he, in willful bad faith, multiplied the proceedings in this case. The court will deny Defendants' motion on this ground.[20]

## V. CONCLUSION

For the reasons set forth above, the court will grant in part and deny in part Scott's renewed motion for judgment as a matter of law, and will vacate the jury's damage award of $5,000 in favor of Burks. The court will grant in part and deny in part Plaintiffs' motion for attorney's fees under 42 U.S.C. § 1988(b), and will order Scott to pay $75,468.28 each to Robb and Roberts, $37,734.14 to Young, and $18,659.75 to Burks, within forty-five days of the date of the Order accompanying this Memorandum. The court will deny Defendants' motion for attorney's fees under 42 U.S.C. § 1988(b) and 28 U.S.C. § 1927.

An appropriate Order follows.

---

**19.** The court directs Plaintiffs' counsel's attention to the *Final Report of the Committee on Civility of the Seventh Federal Judicial Circuit*, 143 F.R.D. 441 (1992), which noted the many harmful effects of lawyers' and judges' incivility on the judicial process. The committee also stated: "If change is to come, it must stem from the individual effort of each participant in the litigation process as part of a personal obligation assumed equally by lawyers and judges." *Id.* at 446. The court believes it satisfied its obligation by respectfully and patiently encouraging Plaintiffs' counsel to take a more civil approach to the court and opposing counsel. Plaintiffs' counsel

should ask himself whether he is satisfied with his effort in this respect.

**20.** Defendants have listed numerous examples of Plaintiffs' counsel's unprofessional behavior and reprehensible conduct throughout this litigation. If they continue to believe that a sanction against Plaintiffs' counsel is warranted, they should inform the Disciplinary Board of the Supreme Court of Pennsylvania through appropriate affidavits and other process. (See Defs.' Mem. Supp. Atty's Fees Ex. E.)

## ORDER

AND NOW, TO WIT, this 26th day of August, 1997, upon consideration of Defendant Richard Scott's Motion for Judgment as a Matter of Law, and Plaintiffs' opposition thereto, IT IS ORDERED that said motion is GRANTED IN PART and DENIED IN PART. The damages award in favor of Plaintiff Valorie Burks and against Richard Scott in the amount of $5,000 is VACATED.

Upon consideration of Defendants Richard Scott and the City of Philadelphia's Application for Attorney's Fees from Plaintiffs and Plaintiffs' Counsel, and Plaintiffs' opposition thereto, IT IS ORDERED that said motion is DENIED.

Upon consideration of Plaintiffs' Motion and Petition for Attorney's Fees and Costs Pursuant to 42 U.S.C. § 1988, and Defendants' opposition thereto, IT IS ORDERED that said motion is GRANTED IN PART and DENIED IN PART. Scott, within forty-five (45) days of the date of this Order, shall pay $75,468.28 each to Plaintiff Linda Robb and Plaintiff James Roberts, $37,734.14 to Plaintiff Terence Young, and $18,659.75 to Plaintiff Valorie Burks, for attorney's fees and costs related to this litigation.

Upon consideration of Plaintiffs' Motion to Supplement Their Motion and Petition for Attorney's Fees and Costs Pursuant to 42 U.S.C. § 1988, and Defendants' opposition thereto, IT IS ORDERED that said motion is GRANTED IN PART and DENIED IN PART. The court grants Plaintiffs permission to supplement their motion. The requested attorney's fees will be partly granted and partly denied, consistent with the court's disposition of Plaintiffs' motion for attorney's fees.