John DOE, Plaintiff,

v.

William F. WARD, et al., Defendants.

No. CIV. 98–1746.

United States District Court,
W.D. Pennsylvania.

Sept. 16, 2003.

Karl Baker, Defender Association of Philadelphia, Philadelphia, PA, Kirk Henderson, Witold J. Walczak, ACLF of PA, Pittsburgh, PA, for John Doe.

Thomas F. Halloran, Office of the Attorney General, Pittsburgh, PA, for William F. Ward, in his official capacity as the Chairman of the Pennsylvania Board of Probation and Parole, Jeffrey Miller, in his official capacity as the Commissioner of the Pennsylvania State Police.

## MEMORANDUM ORDER

CINDRICH, District Judge.

Pending before the court is plaintiff's petition for attorneys' fees and costs pursuant to 42 U.S.C. Section 1988 (Doc. No. 36).

### I. *Background*

This action arose from the application of the Pennsylvania Registration of Sexual Offenders Act, popularly known as "Megan's Law," 42 Pa. Cons.Stat. Sections 9791–9799.6, amended by S.B. No. 380, 184th Reg. Sess., Act No. 2000–18, 2000 Pa. Legis. Service. No. 2 at pp. 53–68 (also referred to generally herein as the "Act"), to plaintiff John Doe ("Doe").[1] Doe filed the instant complaint seeking preliminary and permanent injunctive relief in connection with the defendants' application of the Act to him to the extent that he had been subjected to community notification for an out-of-state conviction without first being afforded some process. Although Doe had asserted only federal constitutional claims pursuant to 42 U.S.C. Section 1983 (the "Civil Rights Act"), the court raised the issue *sua sponte* of whether the state's handling of Doe violated the Pennsylvania Interstate Compact Concerning Parole statute, 60 Pa. Stat. Ann. Section 321 (the "Interstate Compact") and ordered the parties to file supplemental briefs on the same. The court subsequently granted Doe's motion for summary judgment and requested injunctive relief finding that the Interstate Compact precluded the state from subjecting Doe to community notification without first providing him with the same process afforded in-state sex offenders. Thus, although the court did not rule on any of his constitutional claims, Doe ultimately obtained the relief he sought based on state law.

The defendants subsequently filed an appeal with the United States Court of Appeals for the Third Circuit, but later withdrew the same. Thereafter, Doe filed the instant petition for attorneys' fees and costs which defendants duly responded to. Doe later filed a motion to withdraw the petition in light of the parties' efforts to reach a settlement on fees and costs. Negotiations broke down sometime thereafter, as Doe later filed a motion to reinstate the petition.

1. John Doe is a pseudonym being used to protect the plaintiff's identity.

## II. *Analysis*

 An award of attorneys' fees and costs in civil rights cases is governed by 42 U.S.C. Section 1988 which provides: "In any action or proceeding to enforce a provision of section ... 1983 ... the court, in its discretion, may allow the prevailing party, ... a reasonable attorney's fee as part of the costs ...." 42 U.S.C. Section 1988. "The party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable. To meet its burden, the fee petitioner must 'submit evidence supporting the hours worked and rates claimed.'" *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990)(quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The burden then shifts to the opposing party to "challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee." *Id.* at 1183 (citing *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713 (3d Cir.1989)). The court may not "decrease a fee award based on factors not raised at all by the adverse party." *Id.* (citing *Bell*, 884 F.2d at 720). "Once the adverse party raises objections to the fee request, the district court has a great deal of discretion to adjust the fee award in light of those objections." *Id.* (citing *Bell*, 884 F.2d at 721).

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. The result of this computation is called the lodestar and is "strongly presumed to yield a reasonable fee." *Washington v. Philadelphia Co. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir.1996) (citing *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992)).

As to the number of hours, the court should exclude excessive, redundant or otherwise unnecessary hours as not "reasonably expended." *Rode*, 892 F.2d at 1183 (citing *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933). The court may also exclude hours spent litigating claims on which the party did not succeed and that were distinct in all respects from the claims on which it did succeed. *Id.* The court may also deduct hours that the party seeking fees has failed to adequately document. *Id.*

The hourly rate is calculated according to the prevailing market rate in the community. *Id.* (citing *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The court must assess the "experience and skill" of the prevailing party's attorneys and determine the rate prevailing in the community for attorneys "of reasonably comparable skill, experience, and reputation." *Id.*

Once the "lodestar" has been determined by multiplying rate times hours, the court may make an adjustment. *Id.* The burden of persuasion is on the party seeking such an adjustment. The lodestar can be adjusted downward if it is not reasonable in light of the results obtained. *Id.* For example, "[t]his general reduction accounts for time spent litigating wholly or partially unsuccessful claims that are related to the litigation of the successful claims." *Id.* (citation omitted). This adjustment should be taken independently of other adjustments and should be the first adjustment applied to the lodestar. *Id.* (citation omitted).

Doe requests a total award of $79,379.75 consisting of 331.20 attorney hours at various rates, and $713.50 in costs. He submitted a detailed listing of the hours spent by each attorney with a date and description of work performed. The break down

of the total fees for each attorney is as follows:

i) Witold J. Walczak ("Walczak"):
 (237.25 hours × $250) $ 59,312.50
 ( 23.10 hours × $250) 5,775.00
 $ 65,087.50

ii) Karl Baker ("Baker"):
 (13.65 hours × $250) $ 3,412.50

iii) Kirk J. Henderson ("Henderson"):
 (57.20 hours × $175) $ 10,010.00

 Total 331.20 (hours) $78,510.00

Defendants raise several objections to the rates and hours claimed which we address in turn.

A. *Rates*

Defendants object to the requested hourly rates of $250 for Baker and $175 for Henderson. Defendants also object to a $250 hourly rate for certain hours Walczak spent on the fee petition.[2] The resolution of this dispute over the reasonableness of the hourly rate requires us once again to enter into the murky realm of fee dispute jurisprudence, a subject which has consumed almost as much of trial and appellate court time as the underlying disputes on the merits.

 The issue of what evidence should be considered when determining a reasonable hourly rate has never been satisfactorily resolved even though that issue has appeared in the margins of virtually every fee request before the court. The United States Supreme Court has held that "[t]o inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the communi-

ty for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. 1541. Supreme Court opinions "have repeatedly stressed that attorney's fees awarded under [Section 1988] are to be based on market rates for the services rendered." *Missouri v. Jenkins*, 491 U.S. 274, 283, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). The Court has explained that:

> [i]n determining how other elements of the attorney's fee are to be calculated, we have consistently looked to the marketplace as our guide to what is "reasonable." In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), for example, we rejected an argument that attorney's fees for nonprofit legal service organizations should be based on cost. We said: "The statute and legislative history establish that 'reasonable fees' under Section 1988 are to be calculated according to the prevailing market rates in the relevant community...." *Id.*, at 895, 104 S.Ct., at 1547.

*See also, e.g.,* [*Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 732, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) ] (O'Connor, J., concurring) (controlling question concerning contingency enhancements is "how the market in a community compensates for contingency"); [*City of Riverside v. Rivera*, 477 U.S. 561, 591, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) ] (Rehnquist, J., dissenting) (reasonableness of fee must be determined "in light of both the traditional billing practices in the profession, and the fundamental principle that the award of a 'reasonable' attorney's fee under Section 1988 means a fee that would have been deemed reasonable if

---

**2.** An hourly rate of $275 was requested for Walczak in the petition. Defendants indicate in their response that they do not oppose an hourly rate of $250 for Walczak. In a reply to defendants' response, Doe states that he is now only seeking a $250 rate for Walczak. Thus, the only objections related to Walczak's rate is with regard to certain hours he spent on the fee petition which we discuss below.

billed to affluent plaintiffs by their own attorneys"). A reasonable attorney's fee under Section 1988 is one calculated on the basis of rates and practices prevailing in the relevant market, i.e., "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Blum,* supra, 465 U.S., at 896, n. 11, 104 S.Ct., at 1547, n. 11, and one that grants the successful civil rights plaintiff a "fully compensatory fee," *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983), comparable to what "is traditional with attorneys compensated by a fee-paying client." S.Rep. No. 94–1011, p. 6 (1976), U.S.Code Cong. & Admin. News 1976, pp. 5908, 5913.

*Id.,* 491 U.S. at 285–86, 109 S.Ct. 2463; *see Blanchard v. Bergeron,* 489 U.S. 87, 91, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). "As nearly as possible, market standards should prevail, for that is the best way of ensuring that competent counsel will be available to all persons with bona fide civil rights claims. This means that judges awarding fees must make certain that attorneys are paid the full value that their efforts would receive on the open market in non-civil-rights cases . . . ." *Hensley,* 461 U.S. at 447, 103 S.Ct. 1933 (Brennan, J., concurring in part and dissenting in part). In recognizing the market as an active institution, the Supreme Court has noted how "the discipline of the market," which presumes give-and-take between buyers and sellers, will prevent overcharging for certain aspects of lawyers' work. *Jenkins,* 491 U.S. at 287 n. 9, 109 S.Ct. 2463.

The United States Court of Appeals for the Third Circuit has made the same findings, concluding that "[o]ur premise has been that the reasonable value of an attorney's time is the price that time normally commands in the marketplace for legal services in which those services are offered." *In re Fine Paper Antitrust Liti-*

*gation,* 751 F.2d 562, 590 (3d Cir.1984). The Court of Appeals' invocation of market principles has included identifying a geographical market for hourly rates where that matter has been disputed. *Public Interest Group of NJ, Inc. v. Windall,* 51 F.3d 1179 (3d Cir.1995).

The Supreme Court in *Blum* listed the several ways that fee awards will not approximate an ideal market. 465 U.S. at 895 n. 11, 104 S.Ct. 1541. Hourly rates vary widely, there is no long-term relationship between the payor and the recipient of the fees, and there is no negotiation. We add what we consider another critical element, the limited amount of reliable information publicly available to the user of legal services. Despite the fact that we can only simulate a market, we are nonetheless obligated to consider market principles in determining reasonable hourly rates.

It is worth recalling that the very essence of a market is the opportunity for sellers *and* buyers. There is no way to refer to a market and not consider the flow of activity in both directions. Certainly inherent in an hourly rate is information about what buyers are paying. But this assumption may be subject to questions; whether there are variations in receipts relative to charges, and the degree of those variations, is a fact question to be resolved. In other words, one could never understand a market only by knowing what the seller was charging; one must also learn what buyers are paying.

We appreciate the position taken by fee-petitioners in other cases before the court, that there is no "customary hourly fee" in certain categories of cases, such as civil rights cases, where contingency fees, as opposed to hourly fees, are the norm. The average citizen who seeks representation in such cases typically does not have the financial resources to pay an hourly rate or

a large retainer. Indeed, the very existence of fee-shifting statutes is based on the recognition that some citizens would be unable to pay for a lawyer to protect certain rights.

In one respect, this observation highlights a hole in the evidentiary support for fee awards. Is it an accurate description of the market, for example, that no one pays for civil rights representation? Without unduly taxing our resources, we can think of at least one area where lawyers are paid handsomely for protecting the civil rights of their clients—that is, in cases brought by media organizations to vindicate First Amendment rights. Others might include lawyers representing advocacy groups supporting the free exercise of religion (usually, as pitted against the establishment clause of the First Amendment). A third could be lawyers who represent pro-life or pro-choice organizations. The issue may need further investigation to corroborate the contention that fee-paying clients in certain categories of cases do not exist. In any event, it is discomforting to consider that important decisions might rest on "meaningless fiction," a concept that should provoke an aversive reaction in a fact finder. Thus, where does the court find market information on which to base its determination of reasonable hourly rates?

One place we would not look is in the statements by lawyers in supporting affidavits attesting to the reasonableness of their own or other lawyers' hourly rates. A similar statement is a lawyer's *opinion* that a certain hourly rate is comparable to rates charged in the relevant market. It is not surprising that presenting such evidence in support of a fee petition has become routine and accepted by the courts for years without question. Indeed, the Court of Appeals seemed to assign weight to attorneys' opinions of reasonableness in one of its significant attorney's fee opinions. *Washington*, 89 F.3d at 1036 ("These affidavits stated that Mr. Epstein's requested hourly rate of $250 was reasonable and within the range of prevailing rates charged by Philadelphia attorneys . . . .")

Upon reflection, however, a lawyer's testimony that a certain hourly fee is reasonable is no more helpful than a lawyer's testimony that a certain product is defective, or certain contract language is ambiguous. Determining the reasonableness of a fee request is a mixed question of law and fact, but it is a question reserved for the court. A simple observation shows why. The term "reasonable" by its essence contains considerable play, regardless of what it is applied to. Ten lawyers perhaps could legitimately state that an hourly rate of $300 was reasonable because of the superior quality of representation, a belief that lawyers in the market are underpaid, overhead has gone up, or a number of other factors. If only one lawyer in ten charged and received that amount, however, the market might have a different answer about whether that rate is reasonable. Establishment of market rates thus is more a matter of numbers than of beliefs or opinions. And market rates are what we are bound to find.

Consequently, a lawyer's opinion about whether a fee is reasonable adds little to the evidence necessary to arrive at this legal conclusion. While the Federal Rules of Evidence provide that lay witnesses may offer opinions, and opinions may cover the ultimate issue to be decided, Fed. R.Evid. 701, 704, lawyer testimony about the reasonableness of fees is unhelpful when offered as a substitute for bare facts about fees in the market. "The matter of an attorney's marketplace billing rate is a factual question . . . ." *Washington*, 89 F.3d at 1035.

What we now find necessary are a few facts that affidavits in support of fee re-

quests seldom contain: What do *you*, the testifying lawyer, customarily charge your clients for similar work? And what do they pay? From these figures, over a broad enough sample,[3] it should be possible to arrive at a market rate. For a rate to qualify as being derived from the market, as the law requires, it should be based on information that has market characteristics—unbiased, mostly rational, and consisting of hard facts.

Testimony about what other lawyers charge is relevant, but may not carry as much evidentiary weight, depending on the manner in which this information was obtained. In other words, how familiar is the lawyer witness with the billing and income data of other lawyers? If very familiar, as with a partner, such evidence would carry substantial weight. If somewhat familiar, as with a telephone conversation just prior to submitting an affidavit supporting a fee request, such evidence would carry less weight. Similarly, printed surveys have a superficial appeal as a single source for collecting a range of fee data, but of course are hearsay. Often the information they contain is dated as well.

Another source of supporting information that is sometimes cited by counsel are court awards of fees in other, similar cases. This practice likewise is understandable. Under any method of analysis, court fee awards in other cases would be a credible source of supporting information. They can be relied on for the persuasive value of having been determined by a neutral person intimately familiar with the criteria on which fees are based, and thus have a precedent-like effect.

But such references should not be blindly accepted. Because of the precedential quality of fee awards, they are easy to repeat without analysis. *See. e.g., Smith v. Phila. Hous. Auth'y,* 107 F.3d 223, 226 (3d Cir.1997) (district court adopted lower rate because that rate used in four other cases). The dictum that fee litigation should not be treated as major litigation makes this approach tempting and legally defensible.[4]

---

**3.** The Court of Appeals for the Third Circuit has made findings about market rates based on evidence from one outside lawyer for each side. *Hurley v. Atlantic City Police Dept.,* 174 F.3d 95, 131–32 (3d Cir.1999), *cert. denied,* 528 U.S. 1074, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000). We would not consider this the most reliable way to find market facts. On the other hand, as we explain below, courts must make rulings with the information presented, and frequently have no control over the content or scope of that information.

**4.** While admitting to having hidden behind this pronouncement in prior decisions, the court cannot leave the issue without adding that it is one of the emptiest phrases in our jurisprudence. Attorney's fee questions most definitely constitute major litigation, and related decisions are scrutinized on appeal in a manner that makes this point abundantly clear. *See, e.g., Washington,* 89 F.3d 1031 (17 pages with dissent, 6 issues); *Windall,* 51 F.3d 1179 (10 pages, 5 issues). The Court of Appeals for the Third Circuit *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 845

(3d Cir.1994), while noting how court time is "precious," finds that paralegal hours are compensable under the bankruptcy code in a 20 page opinion that includes a footnote reviewing opinions from two-thirds of federal districts. A duly contested, comprehensive challenge to a fee request might well call for the type of analysis in *Apple Corps. Ltd. v. Int'l Collectors Society,* 25 F.Supp.2d 480 (D.N.J. 1998) (19 pages, 9 pages of tables, 43 West headnotes).

The gravity of fee decisions can be measured another way. In *Washington,* for example, the fee request was more than seven times the jury verdict. 89 F.3d at 1039. Thus, a defendant may suffer a modest loss on the ultimate decision about rights that we are trained to hold dear, but could be wiped out by the "minor" issue of attorney fees. Imagine how free a district court will feel about its license to handle that issue as subsidiary. Suggestions that fee matters are of secondary importance, however, are little more than appellate lip service. We frequently decide dispositive motions that require less effort from the parties and the court than fee petitions.

*See, e.g., Windall,* 51 F.3d at 1190. But a court is not in the market. A judge who comes to the bench from a law practice will know what he and his colleagues charged, what clients paid, and how bills were discounted, and will have some secondhand knowledge of what other lawyers charge. But this information is bound to get stale after several years.[5] The bottom line is that if legal research reveals that the hourly rate a district court awarded in previous cases was not based on market information, then that determination is subject to question, regardless of how many times it was subsequently adopted. "Markets know market values better than judges do." *Busy Beaver,* 19 F.3d at 854 (quoting *In re Continental Illinois Sec. Litig.,* 962 F.2d 566, 570 (7th Cir.1992) (Posner, J.)).

Perhaps the major reason court fee awards vary in their reliability as market evidence is illustrated by others the court has decided: namely, awards can be based not on receipt of comprehensive affirmative evidence from the requesting party (acknowledging that certain minimum evidentiary thresholds *must* be met), but on the absence of comprehensive argument or evidence by the opposing party. This is not an uncommon occurrence. *See, e.g., Blum,* 465 U.S. at 892 n. 5, 104 S.Ct. 1541, ("petitioner failed to submit to the District Court any evidence challenging the accuracy and reasonableness of the hours charged"); *Hurley,* 174 F.3d at 131 (waiver of hearing on disputed hourly rate); *Washington,* 89 F.3d at 1036 (district court cannot disregard uncontested evidence

about hourly rates). These results reinforce the uncontroversial conclusion that market facts are best obtained from participants in the market itself, and not from those on the periphery—including courts.

In sum, the court needs market information to make an attorney's fee award. To do this we need evidence about the paying, arms-length market. If this does not include plaintiffs pursuing civil rights claims, we must draw the closest analogy. A reasonable method to make these findings would be for each side to submit evidence from several practitioners that provides information at least as to:

1. What they charge;

2. Under what conditions, if any, are there variations between charges and receipts;

3. How the testifying lawyer matches up with the requesting lawyer's qualifications;

4. How the type of legal work which has produced these fees compares to the legal work at issue.

If necessary, the court would conduct a hearing at which witnesses could be examined further. On one hand, this process could be cumbersome. On the other hand, once undertaken, it should be genuinely valid precedent for similar fee requests in this court, and thus would not need to be repeated for every case.

That being said, neither party has requested an evidentiary hearing. Moreover, both sides had a full opportunity to

---

The court's position on the true state of how fee litigation is handled is no better phrased than by Judge Aldisert in his concurring and dissenting opinion in *Washington.*

5. In the context of fees for bankruptcy work, the Court of Appeals for the Third Circuit said:

A bankruptcy judge, typically far removed from the economics of law practice and the

exigencies of making recurring business judgments about the most prudent and cost-effective method for performing a given task with adequate assurances of quality in a developing, competitive legal market, is generally not well-equipped to review subjectively the law firm's allocation of responsibilities and billing practices.

*In re Busy Beaver,* 19 F.3d at 853.

submit any materials they deem necessary to support their respective positions on what constitutes a market rate for Baker and Henderson. Thus, we will proceed by what we consider to be the default method currently in place.

### 1. *Baker*

■ In support of the $250 hourly rate requested for Baker, Doe submitted an affidavit of Baker wherein he states that he has been a salaried employee of the Philadelphia Defender Association, which provides indigent criminal defense services free of charge, since approximately 1975. Pl's Pet. (Doc. No. 36) at Ex. 1a. He has been the Deputy Chief of the appeals division of that organization since 1989. *Id.* Although he does not specify which community, Baker states that an hourly rate of $250 for his services reflects the community market rate for attorneys of comparable skill and experience. *Id.* Baker also contends that he included in his time sheet only those hours that could reasonably be billed to a private client. *Id.*

Doe also submitted the affidavits of attorneys David Rudovsky and Paul Boas in support of Baker's rate. Pl's Reply (Doc. No. 43) at Exs. 4 and 5. Rudovsky states that he has been practicing law in the Philadelphia area for 33 years and that the bulk of his practice consists of civil rights litigation. *Id.* at Ex. 4. He also states that he is familiar with Baker's legal work and that Baker is the leading litigator on issues arising under Pennsylvania's Megan's Law. *Id.* He further contends that he is familiar with the prevailing market rates in the Philadelphia legal community for services similar to those provided in civil rights litigation by attorneys with Baker's experience and that an hourly rate of $250 is consistent with such prevailing community rates.

Boas states that he has been practicing in Pittsburgh since 1972 in the areas of criminal defense and civil rights litigation. *Id.* at Ex. 5. He contends that he is familiar with the prevailing billing rates for Pittsburgh civil rights lawyers and opines that a $250 rate for someone with Baker's experience and reputation would be a reasonable rate in the Pittsburgh community. *Id.* He also states that he successfully litigated a civil rights case in this district eight years ago and was awarded a $225 hourly rate.

Baker's and Rudovsky's affidavits are somewhat supportive of a $250 rate for Baker, as this evidence establishes that Baker is a respected lawyer in the area of Pennsylvania's Megan's Law with almost thirty years experience. Rudovsky's opinion as to community rates is not helpful, however, as those statements are limited to the Philadelphia community. Boas' affidavit provides more helpful information as he refers to rates in the Pittsburgh community. Even more on point, although as previously discussed there may be weaknesses in relying on such evidence, he references an actual hourly rate that he was awarded in a civil rights suit in this district. That award was made several years ago and was $225 per hour. It is certainly reasonable that Boas, an attorney with roughly the same years experience as Baker, would now command a $250 rate. This evidence, which is the type of evidence consistently accepted by the Court of Appeals as adequately supporting a requested hourly rate, supports the requested $250 hourly rate for Baker.

Defendants argue that a $200 hourly rate for Baker is more reasonable. The only evidence cited by defendants in support of their position is a July 1996 article from a publication by The Allegheny County Bar Association, Federal Court Section. Defs' Sur Reply (Doc. No. 44). The article lists a range of hourly rates in the Pittsburgh area for attorneys of various years

of experience. *Id.* The author indicates that the rates were derived from a 1989 survey conducted by Neighborhood Legal Services which were updated to 1995 by applying some unspecified Consumer Price Index figures. *Id.* Overlooking the obvious hearsay problem with such evidence, as there is no supporting affidavit accompanying it, this article does not support defendants' argument. First, the article lists estimated rates for 1995, whereas the instant litigation took place several years thereafter. Also, Baker would fall into either the category of "Attorney with more than 10 years experience", which has a range of hourly rates of $175 to $225, or the category of "Supervisory Attorney", which has a range of hourly rates of $180 to $230. *Id.* Baker, an attorney with nearly thirty years experience, half of which has been as a supervisory attorney, would most likely fall in the high end of these ranges. Considering that those rates were $225 and $230 in 1995, it is reasonable to assume that such rates would equal or exceed $250 during the pendency of the instant suit which took place several years later. Thus, the article provided by defendants actually supports a $250 hourly rate for Baker.

Accordingly, defendants' objection to the requested hourly rate for Baker is denied. We find that a $250 hourly rate for Baker, a respected attorney with approximately thirty years experience and an expertise in Pennsylvania's Megan's Law, is in line with those prevailing in the Pittsburgh community for similar services by lawyers of reasonably comparable skill, experience, and reputation.

### 2. *Henderson*

■ In support of the $175 hourly rate requested for Henderson, Doe submitted an affidavit of Henderson wherein he states that he has been an employee of the Appellate Division of the Allegheny County Law Office of the Public Defender since 1993 and handled one of the first Megan's Law appeals in Allegheny County. Pl's Pet. (Doc. No. 36) at Ex. 2a. He contends that an hourly rate of $175 reflects the Pittsburgh community market rate for attorneys with his skill and experience. *Id.* He also states that he included in his time sheet only those hours that could reasonably be billed to a private client. *Id.*

Doe also submitted the affidavits of E.J. Strassburger and Richard O. Early in support of Henderson's rate. Pl's Reply (Doc. No. 43) at Exs. 2 and 3. Strassburger has been practicing law in Pittsburgh since 1973. *Id.* at Ex. 2. He is currently a principal in a seventeen lawyer firm located in Pittsburgh and is familiar with prevailing billing rates in the area. *Id.* He contends that an attorney in his firm with the same years experience as Henderson would be billed at $180 to $210 per hour, which is lower than the rates charged by many other Pittsburgh firms. *Id.* He goes on to conclude that a $175 hourly rate for Henderson is within the billing rates charged by attorneys of comparable skill and experience. *Id.*

Early states that he graduated law school in 1992, the same year Henderson graduated, and that he currently practices in a Pittsburgh law firm which bills his time at $175 to $200 per hour. *Id.* at Ex. 3. He contends that he is generally familiar with the prevailing billing rates in Pittsburgh for civil rights cases and that his rate is at or below rates charged by similarly experienced attorneys. *Id.*

These affidavits are supportive of a $175 rate for Henderson, as this evidence establishes that Henderson is a nine year practitioner with Megan's Law experience. Moreover, Strassburger's and Early's affidavits both indicate that their respective firms bill at least $175 for attorneys with Henderson's years of experience. This evidence supports the requested $175 hourly

rate for Henderson and again is the type of evidence consistently accepted by the Court of Appeals as adequately supporting a requested hourly rate.

Defendants argue that a $150 hourly rate for Henderson is more reasonable. Again, the only evidence cited by defendants in support of their position is the July 1996 article which does not support the defendants' argument. Henderson would be in the category of "Attorney with 6–10 years experience", which has a range of hourly rates of $140 to $180. Defs' Sur Reply (Doc. No. 44). Henderson, with nine years experience, would most likely fall in the high end of this range. Considering that the high end is $180 and that such rate is from 1995, defendants' article actually supports an hourly rate finding of $175 for Henderson.

Accordingly, defendants' objection to the requested hourly rate for Henderson is denied. We find that a $175 hourly rate for Henderson is in line with those prevailing in the Pittsburgh community for similar services by lawyers of reasonably comparable skill, experience, and reputation.

### 3. *Walczak*

■ As previously noted, the parties have agreed on an hourly rate of $250 for Walczak, based, we assume, upon the sensible assumption that such a rate is warranted for a highly experienced and preeminent civil rights attorney whose reputation for legal excellence is well known. Defendants argue, however, that the $5,775 in requested fees for Walczak's preparation of the fee petition (23.10 hours × $250) should be reduced by one-half because certain tasks performed by Walczak could have been performed by a non-lawyer. Defendants cite *Loughner v. The University of Pittsburgh,* 260 F.3d 173 (3d Cir.2001), wherein the Court of Appeals reviewed the district court's decision to reduce a requested hourly rate in

part because the attorney had performed nearly all of the work on the case and billed his maximum billable rate for all work performed. More specifically, the court explained:

> Having rejected the prevailing party's evidence of rates, the District Court was free to affix an adjusted rate. However, the Court did not explain sufficiently how it reached $175 per hour for all hours worked. The Court acknowledged that Hoover performed nearly all of the work on this case by himself, and that Hoover claimed the highest billable rate for all work performed. A claim by a lawyer for research, a letter concerning a discovery request, the drafting of a brief, and trial time in court is neither fair nor reasonable. Many of these tasks are effectively performed by administrative assistants, paralegals, or secretaries. As such, to claim the same high reimbursement rate for the wide range of tasks performed is unreasonable. Having prevailed in the litigation is not cause to overwhelm the losing party with unreasonable fees and costs. "Hours that would not generally be billed to one's own client are not properly billed to an adversary." *Public Interest Group,* 51 F.3d at 1188.
>
> We see no error of the District Court in reducing Hoover's hourly rate. However, it failed to reach a reasonable rate for the separate tasks performed.

*Id.* at 180.

We note first that here, unlike in *Loughner,* we have accepted the prevailing party's evidence of rates. There is no indication that the prevailing community market rate for an attorney at a particular experience level varies based on specific tasks. Indeed, even the July 1996 article submitted by defendants makes no reference to varying hourly rates within any experience category based on specific tasks per-

formed.[6] That being said, we agree with the general proposition underlying the *Loughner* decision that time for activities that should more effectively and economically be performed by non-lawyers should not be awarded at an attorney rate. Moreover, the costs for clerical work, such as filing and copying, are ordinarily considered to be part of an attorney's rate as office overhead. A close review of Walczak's time sheet reveals that, with a few minor exceptions that will be addressed below, the time spent by Walczak on these types of clerical tasks has not been claimed. *See* Pl's Reply (Doc. No. 43) at Ex. 1.

The confusing part of the *Loughner* decision as applied to the instant case, however, is that many of the other tasks performed by Walczak are included in the Court of Appeals' list of tasks that supposedly are more effectively performed by administrative personnel. As previously noted, the Court of Appeals stated that a claim for maximum attorney rates for telephone calls with a client, legal research, a letter concerning a discovery request, the drafting of a brief, and trial time is not fair because "many" of these tasks are more effectively performed by administrative personnel. What the Court did not do, however, is identify which tasks in its list are better or more effectively performed by a non-lawyer. We believe it would be difficult to argue that any of these tasks are more effectively performed by a non-lawyer. Surely, representation at trial, legal research, and the drafting of briefs are more effectively performed by an attorney. We regard these as essential and fundamental functions of an attorney. From

this court's own painful experience, we know that "briefs", not to mention motions, prepared by paralegals and neophyte lawyers can be easily discerned. Most certainly, these are the types of tasks for which an attorney would bill his or her client. Also, the drafting of a letter concerning a discovery matter would most likely require an attorney's time, at least in initiating the letter and in reviewing it for accuracy and legal propriety. It is a primary responsibility of the attorney to properly discover his or her case, therefore, the attorney should be the most familiar with any matters pertaining to the same. Moreover, in many cases the court is often called upon to resolve important and complex discovery issues like attorney-client privilege issues that may greatly impact the case.

The remaining category in the list, telephone calls with client, is broadly stated. If such calls relate to administrative matters, like billing or scheduling an appointment, we would agree that time spent on those calls should not be reimbursed at an attorney rate. If a call involves the providing of legal advice to the client, explaining a court ruling in the case, or preparing the client for a deposition, however, an attorney rate is warranted. Indeed, communicating with the client on such matters is one of counsel's primary responsibilities. In the rest of the economy, the client's/customer's communication via an 800 number to a computer or a know nothing functionary may have become the norm in recent years, but let us hope that it will never pass muster in the legal profession. In any event, there are no entries for tele-

---

**6.** We note that the dictum that fee litigation should not be treated as major litigation would ring even more hollow if the Court of Appeals required the district court to assign a different attorney rate to each specific task performed. *See* FN 4 *supra.* The court is unaware of any attorneys in this district that bill their clients at multiple rates based on a specific task list. At most, some attorneys bill a premium rate for court time. The evidence of record in this case, however, does not indicate that plaintiff is seeking any such premium rate for any of the requested hours.

phone calls to client listed on the relevant time sheet. The only telephone calls listed are with the various affiants regarding their respective affidavits. Of course preparation and editing the supporting affidavits would require attorney time.

Accordingly, the following time, which we find is more clerical in nature, will be excluded:

— 2/23/01 rev'd defendants' brief; drafted letter to court; computed fees based on D's proposal; drafted and faxed letter to Halloran: (.10 of total time requested of .90 disallowed for estimated time to fax letter)

— 2/27/01 finalized and mailed letter to judge: (.10 of total time requested of .20 disallowed for estimated time to mail letter)

— 11/21/01 r/c Baker and Henderson re comments; finalized brief and appendices; mailed to court: (.10 of total time requested of 3.50 disallowed for estimated time to mail to court)

Pl's Reply (Doc. No. 43) at Ex. 1. An hourly rate of $250, which has not otherwise been challenged, will be awarded for the balance of the time spent by Walczak on the fee petition.

### B. *Hours*

█ Defendants object to certain hours claimed by Henderson and Walczak as being excessive. Defendants also argue that all counsels' hours should be further reduced by 60% due to Doe's lack of success on the constitutional claims. We will first address the specific hour objections. The defendant's argument for a general 60% reduction, however, will be addressed after calculation of the lodestar. As previously noted, the court may exclude hours spent litigating unsuccessful claims that were distinct in all respects from the successful claims. If the unsuccessful claims are related to the litigation of the successful claims, however, the court may adjust the lodestar for time spent on such unsuccess-

ful claims. As we explain later, the successful state law claim in this case was not distinct in all respects from the constitutional claims.

### 1. *Henderson Hours*

Defendants object to 8 hours spent by Henderson for research on "other state's sexual crimes." Doe correctly points out that researching the criminal laws in the state where Doe committed his prior offense was necessary to determine whether such offense carried community notification in that state and whether the offense was equivalent to any Pennsylvania crime for which a Pennsylvania offender would be subjected to community notification. The eight hours spent on that research is reasonable. Accordingly, the defendants' objection to these hours is denied.

Defendants object to 33 hours spent by Henderson on the issue of due process. We agree with Doe in that the due process issue was not a simple one. Moreover, this case was apparently one of first impression and would have required significant research. The 33 hours spent on this issue is reasonable. Accordingly, the defendants' objection to these hours is denied.

### 2. *Walczak Hours*

Defendants object to 35 hours spent by Walczak to prepare the complaint and motion for temporary restraining order ("TRO") and supporting brief. Again, this case was one of first impression and would have required additional effort to prepare. Also, Doe filed a verified complaint to serve as the factual basis for the motion for a TRO. The detail required for such a complaint is significantly greater than that required for a notice pleading. The 35 hours spent on preparing these filings is reasonable. Accordingly, the defendants' objection to these hours is denied.

### C. *Lodestar*

For the foregoing reasons, $75 in fees (.30 hours of Walczak's time at $250 per hour, *see* page 334 *supra*) will be excluded from the total $78,510.00 in total fees requested resulting in a lodestar calculation of $78,435.00.

### D. *Adjustments*

Defendants argue that an across-the-board 60% reduction should be applied to the requested hours because Doe failed to succeed on any of his constitutional claims.

The Supreme Court established certain principles in *Hensley* to guide lower courts in setting fee awards in cases where plaintiffs have not achieved complete success. The Court explained as follows:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." *Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444, at 5049 (C.D.Cal.1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.
>
> It may well be that cases involving such unrelated claims are unlikely to arise with great frequency. Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. *See Davis v. County of Los Angeles,* 8 E.P.D. ¶ 9444, at 5049 (C.D.Cal.1974). Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.
>
> If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.
>
> Application of this principle is particularly important in complex civil rights litigation involving numerous challenges to institutional practices or conditions.

This type of litigation is lengthy and demands many hours of lawyers' services. Although the plaintiff often may succeed in identifying some unlawful practices or conditions, the range of possible success is vast. That the plaintiff is a "prevailing party" therefore may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved. In this case, for example, the District Court's award of fees based on 2,557 hours worked may have been reasonable in light of the substantial relief obtained. But had respondents prevailed on only one of their six general claims, for example the claim that petitioners' visitation, mail, and telephone policies were overly restrictive, ... a fee award based on the claimed hours clearly would have been excessive.

There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment. This discretion, however, must be exercised in light of the considerations we have identified.

\* \* \* \* \* \*

We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Hensley,* 461 U.S. at 434–440, 103 S.Ct. 1933 (footnotes omitted).

■ Doe is entitled to an award of attorney's fees even though his success was ultimately based on state law. *See Williams v. The Hanover Housing Authority,* 113 F.3d 1294, 1298 (1st Cir.1997) ("[I]t is immaterial for Section 1988 purposes that plaintiff's success in the Section 1983 action results from a favorable ruling on a relevant issue of state law, so long as the state law issue and the federal claims being made in the Section 1983 proceeding are closely related.") The state law issue here was not distinct in all respects from the federal constitutional issues.[7] To the contrary, the Interstate Compact issue was based on the same facts that underlie the constitutional claims. Moreover, consideration of the Interstate Compact issue depended in part on an examination of the process afforded in-state versus out-of-state offenders. Such analysis would have been important in the consideration of the constitutional claims. Indeed, the primary relief Doe sought via the constitutional claims was a court order requiring defendants to provide him with the same process that in-state offenders are given under the Interstate Compact. Thus, we find that the Interstate Compact issue and the constitutional claims were sufficiently interrelated to entitle him to a fee award.

With regard to defendants' argument that any fee award should be reduced because Doe did not obtain a ruling on the

7. We note that the Interstate Compact is not purely state law as it is a congressionally sanctioned interstate compact. *See* September 18, 2000 memorandum opinion at (Doc. No. 29).

constitutional claims, we disagree. The Supreme Court explained in *Hensley* that the primary factor to consider when evaluating a potential adjustment to the lodestar is the plaintiff's degree of success. As previously noted, the Court held that "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. Thus, the absence of a ruling on the constitutional claims in this case, where there was success on an interrelated state law claim, would not provide sufficient grounds to reduce the fee award. An evaluation of Doe's success is what is important.

Although an evaluation of success may prove difficult in some cases, given the absence of any definition for such term in *Hensley,* that is not the case here. One could not argue that Doe's success was in any way short of complete, as he obtained essentially all of the relief sought in the complaint. *Hensley* would dictate, therefore, that his attorneys be awarded "a fully compensatory fee" which encompasses "all hours reasonably expended on the litigation ...." 461 U.S. at 435, 103 S.Ct. 1933. The question then becomes whether the 330.90 hours (331.20 requested minus the .30 excluded hours) and resulting $78,435 in fees is reasonable in relation to the results obtained. We find that it is.

Again, this case was one of first impression and dealt with several complex legal issues. Indeed, the complex nature of the Interstate Compact issue alone is evidenced by the court's thirty-nine page opinion and order ruling on the same. *See* (Doc. No. 29). On Doe's part, for example, the case necessarily involved extensive research, including another state's crimes code, and the filing of a fact specific verified complaint; a motion for a TRO, with a supporting brief; a motion to proceed pseudonymously; a response to defendants' motion for summary judgment; a supplemental brief on the Interstate Compact issue; and a response to defendants' motion for reconsideration of the court's ruling in Doe's favor. We also note that the court's *sua sponte* raising of the Interstate Compact issue during the litigation is of no consequence. It would not have been prudent on plaintiff's counsel's part to pursue this case by an Interstate Compact claim to the exclusion of alternative constitutional claims. Indeed, it is always easy to say with the advantage of hindsight which claims counsel should have pursued to the exclusion of alternative theories. The only reason the court did not reach the constitutional issues is because of the strong preference for avoiding premature constitutional decisions. *See Spicer v. Hilton,* 618 F.2d 232, 240–241 (3d Cir.1980). Accordingly, we find that the 330.90 hours, which equal $78,435 in fees is reasonable in relation to the results achieved. Defendants' request that the total hours be reduced, therefore, is denied.

### E. *Costs*

Defendants argue that Doe's requested costs should also be reduced by 60% because he was not successful on the constitutional claims. As we discuss *supra,* we reject this argument. Thus, Doe will be awarded the total of the $713.50 in requested costs.

For the foregoing reasons, **IT IS HEREBY ORDERED** that plaintiff's petition for attorneys' fees (Doc. No. 36) is **GRANTED** in the amount of $78,435 for attorneys' fees and $713.50 for costs for a total award of $79,148.50.